### PERKINS v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. December 21, 1915.)

No. 1365.

1. CRIMINAL LAW ⬅48—RESPONSIBILITY FOR CRIME—"INSANITY."

Insanity, to be available as a defense to a criminal prosecution, must reach the degree of failure to understand the difference between right and wrong.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 53–58; Dec. Dig. ⬅48.

For other definitions, see Words and Phrases, First and Second Series, Insanity.]

---

**2. CRIMINAL LAW ⟨⟩48—RESPONSIBILITY FOR DRUGS—DRUNKENNESS OR INTOXICATION FROM DRUGS.**

Drunkenness or intoxication or delirium from a drug used with knowledge that it is likely to produce intoxication or delirium is not an excuse for crime.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 53–58; Dec. Dig. ⟨⟩48.]

**3. CRIMINAL LAW ⟨⟩57—RESPONSIBILITY FOR CRIME—INSANITY RESULTING FROM DRUGS.**

The long-continued use of alcohol or other drugs, though voluntary, may produce delirium tremens, or other mental derangement violent enough to amount to insanity, and make its victim not responsible under the law for offenses committed by him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 65, 69, 70; Dec. Dig. ⟨⟩57.]

**4. CRIMINAL LAW ⟨⟩48—RESPONSIBILITY FOR CRIME—INSANITY RESULTING FROM DRUGS.**

A person committing a homicide while in a frenzy, produced by an overdose of chloral prescribed by a physician, was guilty of murder or manslaughter, according to the circumstances, if the physician's prescription, or the realized effect of a former dose, or both together, warned him before he had lost control of himself that he might be thrown into an uncontrollable frenzy, as though a patient is not presumed to know that a physician's prescription may produce a dangerous frenzy, he is bound to take notice of the warning appearing on a prescription, especially if he reads the prescription.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 53–58; Dec. Dig. ⟨⟩48.]

**5. CRIMINAL LAW ⟨⟩48—RESPONSIBILITY FOR CRIME—INSANITY RESULTING FROM DRUGS.**

If defendant had good reason to infer from the terms of a physician's prescription, or the oral instructions of the physician, or from the effect of a former dose of the chloral prescribed, or from all these together, that a larger dose would produce unconsciousness, he was not legally responsible for acts committed in a violent frenzy, produced by such larger dose, and which he had no reason to anticipate.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 53–58; Dec. Dig. ⟨⟩48.]

**6. CRIMINAL LAW ⟨⟩48—RESPONSIBILITY FOR CRIME—INSANITY RESULTING FROM DRUGS.**

If defendant was so frenzied by a dose of chloral innocently taken under the direction of a physician as to be thrown into a mental state placing him beyond his own control and beyond the realization of what might be the ill effect of an overdose, he was not legally responsible for acts committed in a frenzy produced by such overdose.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 53–58; Dec. Dig. ⟨⟩48.]

**7. HOMICIDE ⟨⟩309—QUESTIONS FOR JURY—"MANSLAUGHTER"—"VOLUNTARY MANSLAUGHTER"—"INVOLUNTARY MANSLAUGHTER."**

Penal Code, Act March 4, 1909, c. 321, § 274, 35 Stat. 1143 (Comp. St. 1913, § 10447), provides that "manslaughter" is the unlawful killing of a human being without malice; that it is of two kinds "voluntary," upon a sudden quarrel or heat of passion, and "involuntary," in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. Defendant, while a

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

passenger on a steamship, appeared in the saloon insufficiently clothed, and when told by the master to return to his room and put on other apparel, fired his pistol, without notice and without provocation, until every chamber was empty, killing another passenger and wounding the master. The defense was insanity, caused by an excessive use of alcohol and an overdose of chloral. *Held*, that the court did not err in refusing to submit involuntary manslaughter, as the term "involuntary" implies absence of intention to kill, and if defendant was chargeable as a sane man with any intention at all, the firing of the pistol showed an intention to kill.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 649, 650, 652–655; Dec. Dig. ☞309.

For other definitions, see Words and Phrases, First and Second Series, Involuntary Manslaughter; Manslaughter; Voluntary Manslaughter.]

8. HOMICIDE ☞294—INSTRUCTIONS—INSANITY AS DEFENSE.

On a trial for homicide, in which the defense was insanity caused by indulgence in alcohol and drugs, the court charged that insanity must proceed from disease of the mind in some way, or from an act of the providence of God; that it must be an involuntary insanity on the part of the human being; that it must be an insanity produced by disease, whether the disease was temporary or permanent, proceeding as diseases did from an act of God, so that he was incapable at the time of understanding what he was doing, and that he was committing an infraction of the law, but that at the time he was, by something beyond his personal voluntary control, put in that condition. *Held*, that the distinction, thus broadly stated, between insanity produced by disease, coming as an act of God, and that produced by man's own voluntary act was not sound, as actual mental disease, amounting to insanity as distinguished from ordinary intoxication, excuses even when brought about by voluntary dissipation or other vices.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 605; Dec. Dig. ☞294.]

9. CRIMINAL LAW ☞1172—HOMICIDE ☞294—INSTRUCTIONS—INSANITY AS DEFENSE—HARMLESS ERROR.

On a trial for homicide in which the defense was insanity, a physician, whom defendant consulted shortly before the homicide, testified that from defendant's description of his symptoms he feared that defendant might be on the verge of delirium tremens, and that he prescribed chloral as a sedative for defendant's nerves. Defendant testified that he had been drinking more than usual, and after this increase was having frightful visions and hallucinations before he took the chloral, and that the chloral resulted in greatly increased terror and hallucinations. Physicians testified that the prescribed dose of chloral might produce a condition of delirium like that produced by drinking. *Held*, that it was erroneous and prejudicial to charge that there was no evidence of delirium tremens except the testimony of the physician that the symptoms described by defendant made him think defendant was on the verge of delirium tremens, as evidence that he had symptoms indicative of the approach of delirium tremens, and that he afterwards acted as if he did have it, was evidence thereof additional to the apprehensions of the doctor.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3128, 3154–3157, 3159–3163, 3169; Dec. Dig. ☞1172; Homicide, Cent. Dig. § 605; Dec. Dig. ☞294.]

10. CRIMINAL LAW ☞48—RESPONSIBILITY FOR CRIME—INSANITY RESULTING FROM DRUGS.

If delirium amounting to insanity was produced by a dose of chloral, taken in good faith in accordance with a doctor's prescription under the

belief that it would be a sedative, and in that state of delirium defendant committed a homicide, he was guilty of no legal offense, though the chloral might have been harmless but for a settled state of mental disorder produced by habitual drinking.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 53–58; Dec. Dig. ☞48.]

11. CRIMINAL LAW ☞785—WEIGHT AND SUFFICIENCY OF EVIDENCE—EXPERT EVIDENCE.

The testimony of experts is admitted as valuable because based on their special knowledge, derived not only from experience, but from the experiments and reasoning of others, communicated by personal association or through books or other sources, and while it is more or less valuable, according to the source from which it comes, the general proposition that it is of low value unless based on personal experience is not sound, and it was error to charge in effect that the testimony of medical experts, not based on personal experience, was of low value.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1774, 1776–1781, 1889–1894; Dec. Dig. ☞785.]

12. CRIMINAL LAW ☞1172—APPEAL—HARMLESS ERROR—INSTRUCTIONS.

On a trial for homicide in which the defense was insanity caused by taking an overdose of chloral, while an instruction that defendant was presumed to know what effect chloral had was not correct as a general proposition, it was harmless, where defendant had express warning from the prescription of the physician who prescribed chloral not to take more than a certain quantity, and knew that it was a drug that would affect the nerves, and was notified by the terms of the prescription that serious results would follow an overdose.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3128, 3154–3157, 3159–3163, 3169; Dec. Dig. ☞1172.]

13. CRIMINAL LAW ☞412—EVIDENCE—DECLARATIONS OF ACCUSED—ADMISSIBILITY.

On a trial for homicide, where the defense was insanity caused by excessive drinking, and an overdose of chloral prescribed by a physician, the physician's testimony as to defendant's description of his symptoms from which he feared that defendant was on the verge of delirium tremens, was admissible, since wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 894–917, 919–935; Dec. Dig. ☞412.]

14. CRIMINAL LAW ☞1170—APPEAL—HARMLESS ERROR—ADMISSION OF EVIDENCE.

On trial for homicide where the defense was insanity, the exclusion of a physician's testimony as to defendant's description of his symptoms was not prejudicial, where the substance of his complaints to the physician was afterwards admitted.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3145–3153; Dec. Dig. ☞1170.]

15. CRIMINAL LAW ☞1172—APPEAL—HARMLESS ERROR—INSTRUCTIONS.

On a trial for homicide, in which the defense was insanity, while it would have been better to refrain from alluding by way of illustration in the charge to the Thaw Case, such allusion was not sufficiently prejudicial to warrant a reversal, if there had been no other error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3128, 3154–3157, 3159–3163, 3169; Dec. Dig. ☞1172.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

16. CRIMINAL LAW ⚖➜762—INSTRUCTIONS—EXPRESSION OF OPINION AS TO GUILT.

In the federal courts, the trial judge is allowed a large latitude in expressing his opinion as to defendant's guilt, so long as he leaves the ultimate issue of guilt or innocence to the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1731, 1750, 1754, 1758, 1759, 1769; Dec. Dig. ⚖➜762.]

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

George B. Perkins was convicted of manslaughter, and he brings error. Reversed.

See, also, 221 Fed. 109.

W. C. Miller and J. P. K. Bryan, both of Charleston, S. C., for plaintiff in error.

Francis H. Weston, U. S. Atty., of Columbia, S. C., and J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge. The indictment in this case charged the defendant with the murder of F. W. R. Hinman, on the Clyde Line Steamer Mohawk, on a voyage from New York to Charleston, in November, 1914. The trial resulted in a verdict of manslaughter and a sentence of three years' imprisonment. Error is assigned in the exclusion of evidence and in the instructions to the jury.

The case made by the government was this:

About 8 o'clock on November 11, 1914, while Mr. Hinman and his wife were sitting in the saloon of the Mohawk, conversing with the master and other passengers, the defendant appeared, in his bare feet and clothed only in pajamas and a raincoat. He inquired about a wireless message, and made other remarks, either irrelevant or incoherent. Upon being told by the master that he should return to his room and put on other apparel, without notice and without provocation, he fired a pistol through his raincoat pocket at the master and passengers until every chamber was empty. The first shot wounded the master, and two of the later shots killed Hinman. Mrs. Hinman testified that while firing she heard the defendant say "there was others on the boat that he wanted besides." After the shooting the defendant was seized by the order of the master, and carried to Charleston in irons.

The defense was insanity, caused by the use of alcohol and drugs. In support of this plea it was proved that the defendant was an accomplished artist in interior decoration and furnishing, a man of high character, thoughtful and considerate of others. All of the circumstances, as well as the direct evidence, showed plainly not only an absence of motive for the killing, but a lack of acquaintance with the persons present at the tragedy, which tended to disprove actual malice toward any of them. According to the testimony of Horton, defend-

ant's brother-in-law, with whom he lived in Boston, on his return from Europe after the beginning of the war he was without occupation, drank more than usual, and was nervous and restless; and it was in consequence of this condition that he started on a water trip to the South. Dr. Roberts, a physician in New York, to whom the defendant went for advice on his arrival in New York, just before sailing on the Mohawk, testified that he complained of severe headache, great mental strain, nervousness, and insomnia, accompanied by hallucinations; that from these complaints he feared the defendant might be on the verge of delirium tremens, although he did not regard the delirium imminent, nor did he regard the condition serious. He prescribed for the headache phenacetine and caffeine citrate, with the direction that if one powder failed to relieve, it was to be repeated in four hours, and as a sedative for the nervousness, two ounces of chloral hydrate in solution, one teaspoonful, containing 15 grains, to be taken every six hours, to be stopped after three doses. This physician testified that he had never known ill effects from the quantity of chloral prescribed; that the usual effect is a quiet sleep, though on some patients the effect was a period of mental excitement, sometimes going on to delirium, but that such an unfavorable effect was a mere possibility.

Dr. Wilson, a physician of high standing in Charleston, testified as an expert that the effect of 15 grains of chloral might be sleep or an excitement indistinguishable from alcoholic intoxication, with possible hallucinations. As to the effect of the 15 grains followed by 465 grains, he said the patient might be very rapidly plunged into profound coma from which he would never awaken; he might be plunged into a coma from which he might awaken; or that preceding the coma he might be plunged into a state of violent excitement and then fall into a coma. Dr. Wilson further testified that the tendency among medical men and alienists is to regard chloral as a very dangerous drug, and that some even condemn it unqualifiedly on account of the occasional danger. In some cases he said it has developed suicidal tendencies. He expressed the opinion that, given in large doses, it might produce delirium.

The defendant's story was this: For nine years before 1909 he had been a total abstainer, but in that year was a moderate drinker of wines and beer. For some time before leaving Boston he had been depressed on account of the loss of his position, and had begun to drink somewhat more. When he got to New York he was suffering from violent indigestion produced by his dinner. Before leaving Boston he spent a sleepless night, haunted by uncanny visions. Finding himself very nervous on the following morning, he consulted Dr. Roberts, who was a personal friend, and discussed with him his nervous condition and the propriety of going to a sanitarium. The result was an agreement between the defendant and the doctor that a sea trip would be more advisable. The doctor then gave the prescription above mentioned. He had the prescription filled, and began taking the caffeine powders at the drug store, repeating the dose every four hours. When he embarked on the ship he was still feeling nervous

and unwell, and ate little luncheon or dinner; but his testimony shows that he was quite sane. On going to bed the first night he heard demoniacal voices and threats from imaginary persons of turning electricity on him. He reasoned about the matter, supposing his condition to be due to malarial fever, and was conscious of feeling relief when his roommate came in. He was greatly frightened, and attempted to call a physician, but there was none on the ship. He went to the toilet several times in his pajamas and raincoat. He took none of the chloral that night. There was nothing unusual in his conduct the next day, and he was not troubled much with the imaginary voices, but real voices seemed unnaturally loud. He drank nothing during the day but two bottles of beer. Finding himself very nervous on the evening of the second day, he went to bed, putting his pistol under his pillow, as was his habit in traveling, though he had left it in his trunk the night before. He poured into a glass what he supposed to be a teaspoonful of the liquid containing chloral to produce sleep. The defendant thus testifies as to his condition just after taking the medicine, immediately before the homicide.

"Q. When you took that teaspoonful what happened then after that? A. Well, after that I began to be very much more nervous, and very quickly I became nervous, and then came the worst period that I have ever known since I was born. I don't think that I ever felt such agony in my life as I did after that medicine. I don't know whether the medicine had anything to do with it, but I know that immediately I heard the most demoniacal noises, voices of demons that were cursing me. They were laughing the worst laughter that I ever heard in my life, and the only voice that said anything intelligent was one that said, 'Get the battery ready now,' and then I thought I was in for the same accursed experience of last night. Q. What was the condition of your head? A. My head was spinning. I was so frightened that I could hardly stand. My hand was shaking. I don't know whether it was more the sensation of a man in deadly terror, or one who was drunk, but I never felt so badly in my life before. Q. Had you ever taken chloral before? A. No; never in my life, not to my knowledge. In fact I did not know that this was chloral. The doctor asked me if I had taken chloral. I got the impression it was a derivative of chloral, but did not know what it was; I knew it was something strong. Q. In this condition can you describe your condition as clear to you; was it a clear state or cloudy state of mind? A. It was very, very cloudy state; it was like a very bad nightmare. The thing that obsessed me was the voices. I think they might well have driven a man mad, and I did not know whether they were voices from the other world, or whether I was going insane. I was sure they were not human voices. Q. Do you know whether you, at any time, have you any remembrance of taking any more of it? Any recollection, distinct or indistinct, of taking any more of the liquid? A. I have an indistinct recollection, but how true that is I am not prepared to say; I think that I opened the bottle, and put it to my lip, and said to myself, 'I will take enough now to make me sleep anyway.' Q. Is that very clear to you or is it hazy? A. The only thing that makes it seem clear to me is that I have a recollection of a very nasty taste, and I remember taking some clear water, and washed that down, and then I don't remember anything after that. Q. Have you any remembrance at all of going out of your room? A. I have not the slightest recollection of leaving my room at all."

As to his condition after the homicide, the defendant said:

"Q. When did you first know that there had been shooting or harm done to anybody on that ship? A. This is dealing with the time when my brain must have been very much under a cloud. I remember at the hospital, I have a vague recollection of having somebody unlock some handcuffs, then I re-

member speaking, or rather I don't remember anything, within that same period. I dont know when some one woke me up, and I looked over the foot of the bed, and it seemed as though there were a dozen or more people standing at the foot of my bed, and they were all very solemn, and I said to myself, 'I wonder if I am dead and all these people are standing around looking at me.' Then one of these people read a paper; I did not know what it was all about; I did not grasp it until my name appeared, and then something about killing somebody. Probably that was the warrant, but I did not know what it was all about, and I began thinking if I had killed somebody. This paper said that I was under arrest, I think, something like that. I said, 'Have I killed some one?' and this voice, the man who read the paper said, 'Yes, sir,' and I felt very troubled, and it struck me then, and I could not at that point believe that I had killed anybody, because I argued this way: 'If I have killed a man and I am a murderer, this man would not have said, "Yes, sir," to me, he would have said, "Yes." This is ridiculous if he said "sir" to me if I am a murderer,' and I don't remember how long it was before anything else happened."

Dr. Johnson thus testified as to a statement made to him by the defendant in the hospital:

"My recollection of what Mr. Perkins said with regard to that was that he did not know just what was in the drug, but thought it was chloral or some derivative of chloral; that he realized that it was some dangerous drug, and when he took the drug he took it for the purpose of ridding himself of these distressing impressions on his mind, such as the sights and the sounds as I recollect correctly, but especially the sounds that were worrying him at the time, and that he wished to be rid of them, and for that purpose he thought that if he took more of it, he would accomplish that purpose, but, not knowing what result would happen, whether he would be put in a great deal of pain, as I understood from him—I certainly remember his saying that he put his pistol under the pillow so that, in the event that it did not relieve him of these noises and so on, that were distressing him, he would shoot himself."

There was much elaboration of the testimony above collated, but enough is given to make clear the grounds upon which error is assigned.

The chief rules of law applicable to the case are these:

[1] 1. Insanity, to be available as a defense, must reach the degree of failure to understand the difference between right and wrong.

[2, 3] 2. Drunkenness is not an excuse for crime, but the long-continued use of alcohol or other drugs, even though voluntary, may produce delirium tremens, or other mental derangement violent enough to amount to insanity, and make its victim not responsible under the law.

3. Intoxication, or delirium, from a drug used with knowledge that it is likely to produce intoxication or delirium obviously stands on the same footing as intoxication from alcohol.

[4-6] 4. A patient is not presumed to know that a physician's prescription may produce a dangerous frenzy. But he is bound to take notice of the warning appearing on a prescription, and this obligation is, of course, stronger if he reads the prescription. If, for example, in this case, the prescription itself, or the realized effect of the first dose of the chloral, or both together, warned the defendant before he had lost control of himself that he might be thrown into an uncontrollable frenzy, then he would be guilty of murder or manslaughter according to the view the jury might take of the circumstances. If, on the other hand, the defendant had good reason to infer from the terms of the

prescription or the oral instructions of the physician, or from the effect of the first dose, or from all these together, that he would fall into unconsciousness from a larger dose, then he would not be legally responsible for acts committed in a violent frenzy which he had no reason to anticipate. If he was so frenzied by a portion of the medicine innocently taken under the direction of the physician that he was thrown into a mental state which placed him beyond his own control and beyond the realization of what might be the ill effect of an overdose, he would not be legally responsible. We cite the following, among the many authorities on the subject of insanity produced by the use of liquor or drugs which support these propositions: Tucker v. United States, 151 U. S. 164, 14 Sup. Ct. 299, 38 L. Ed. 112; Davis v. United States, 160 U. S. 469, 16 Sup. Ct. 353, 40 L. Ed. 499; Davis v. United States, 165 U. S. 373, 17 Sup. Ct. 360, 41 L. Ed. 750; United States v. Drew, 25 Fed. Cas. 913, No. 14,993; 1 Hale, P. C. 32; 3 Greenleaf, Ev. § 6; State v. Rippy, 104 N. C. 752, 10 S. E. 259.

In the light of these principles we consider the errors assigned in the charge:

[7] The defendant first submits that the District Judge improperly excluded the issue of involuntary manslaughter from the jury. Section 274 of the Penal Code of U. S. gives these definitions:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"First. Voluntary—upon a sudden quarrel or heat of passion.

"Second. Involuntary—in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

From the foregoing statement of the circumstances it seems plain that the real issues were whether the defendant killed the deceased while insane, or in such a condition of heat and passion due to stimulants as would reduce the killing from murder to voluntary manslaughter. There are no elements of involuntary manslaughter. The term "involuntary" implies the absence of intention to kill. The evidence shows beyond doubt that if the defendant was chargeable as a sane man with any intention at all, the firing of the pistol at the deceased showed an intention to kill.

[8] It is next insisted that the District Judge, in the following sentence and in other portions of the charge, denied to the defendant the defense of insanity from delirium produced by long indulgence in alcohol or drugs, or both, as distinguished from ordinary intoxication:

. "I charge you that insanity must proceed from disease of the mind in some way. It must proceed, so to say, from the act of the providence of God, who creates and controls the operations of our bodies and minds when we follow and obey His natural laws. It must be an insanity that is an involuntary insanity on the part of the human being. It must be an insanity produced by disease whether that disease be temporary or permanent by disease proceeding, as diseases do, from the act of God so that he is incapable at the time of understanding what he is doing, and that he is committing an infraction of the law, but at the time he was, by something beyond his personal, voluntary control, put in that condition."

The distinction, thus broadly stated, between insanity produced by disease coming as an act of God and that produced by a man's own vol-

untary act is not sound, for real mental disease amounting to insanity, as distinguished from ordinary intoxication, excuses, even when brought about by voluntary dissipation or other vice. But consideration of the charge on this subject shows that the District Judge was, at the moment, drawing the distinction between intoxication or other derangement voluntarily brought on by indulgence immediately preceding the alleged criminal act, and insanity coming in the ordinary course of nature, and that he did not mean to say that a fixed diseased state of the mind, resulting from past indulgence in liquors or drugs, would not excuse. This is made plainer by the following instructions, given at the instance of the defendant:

"While the law does not excuse a crime committed by a person under the influence of intoxicating liquors, that is, in a fit of intoxication and while it lasts, yet if the accused was not intoxicated, that is, not drunk and under the influence of intoxicating liquor or any other intoxicating element voluntarily taken by him at the time of the homicide, but was insane from an attack of delirium tremens, resulting from past indulgence in intoxicating elements, so long past as to have resulted in a diseased mind and not the direct result of the accused's voluntary action at the time, such insanity is a complete defense to any criminal act, committed while so insane."

We should hesitate, therefore, to reverse the judgment for the error in the above-quoted general proposition laid down in the charge but for other fatal errors.

[9] The instruction was given to the jury that there was no evidence of delirium tremens, except the testimony of Dr. Roberts that the symptoms described to him by the defendant, and his attitude at the time, made him think he was on the verge of delirium tremens. This instruction was erroneous and prejudicial. The defendant himself testified that he had been drinking more than usual before he left Boston, and that after this increase he was having frightful visions and hallucinations before he took the chloral. It is common knowledge that such terrors are concomitants of delirium tremens. These symptoms, if they existed, tended to show a condition bordering on delirium. To this is to be added the testimony, above recited, from Dr. Wilson and Dr. Roberts, to the effect that a dose of 15 grains of chloral might produce a condition of delirium like that produced by drink, and the testimony of the defendant that while in this condition of excessive mental distress, bordering on delirium, he took the dose of chloral prescribed by the doctor, with the result of greatly increased terror of imaginary demons cursing and threatening him. It may be that this dose of chloral threw the defendant into the delirium commonly known as delirium tremens, with which he was already threatened from the continuous use of liquors. If the defendant had these symptoms indicative of the approach of delirium tremens, and afterwards acted as if he did have it, it cannot be said that there is no evidence of his having it except the apprehensions of the doctor.

[10] That the defendant was in some sort of delirium when he committed the homicide seems evident. The pivotal issue was this: If delirium amounting to insanity was produced by the dose of chloral, taken in good faith in accordance with the doctor's prescription, under the belief that it would be a sedative, and in that state of delirium

228 F.—27

the defendant committed the homicide, he would not be guilty of any legal offense, although the chloral might have been harmless but for a settled state of mental disorder produced by habitual drinking. If, on the other hand, the defendant was not thrown into this condition by the prescribed dose of chloral, but by an excessive quantity, taken after he had realized ·the bad effects, if any, of the small quantity prescribed, or taken with notice from any source that it might put him out of his reason, then he would be responsible for the risk which he knowingly assumed in taking ·a larger quantity, and for his action in the delirium which ensued.

[11] It was on this question that the expert testimony became important in conjunction with the testimony of the defendant. The low; estimate placed by the District Judge in his charge on the testimony of expert witnesses as to matters, connected with the science or art in which they are proficient, not within their personal experience, is not sustainable on principle or authority. This estimate is indicated by the following extracts from the charge:

"Now, I charge you that· expert testimony has fallen into what I might term, in many respects, 'an undeserved disrepute.' You see in; the papers jokes about the experts, especially in cases of insanity—so many come up on one side and swear he is sane; so many come up on the other side and swear that he is insane—but I charge you that expert testimony is admissible by law, and it is very valuable within its proper limitations, and that is the expert testimony of a man who knows something from his own experience. The expertness of a railroad engineer who runs an engine, speaking about what he does, is skilled testimony, the testimony of an expert mining engineer, who goes many feet under ground, as to the best ways of mining coal, is a further valuable adjunct to testimony, but when a man calls himself an expert and proceeds to speak expertly about matters not within his own knowledge and experience, then his testimony begins to be of less value, when he begins to speak from books, what other people have told him; for that depends upon what credit those other people were entitled to. You have a, right, when a ·man says he is an expert; he has done so and so; he is on the stand before the jury—you have a right to cross-examine him as to what he testifies to have done.; and, if he says that 'I myself gave 15 grains of chloral to a man, and he became insane,' no one can dispute that that is testimony of very high character; but when he testifies from the books, showing the experiences of another, you have no way of checking such observations, and what he states is only, so to say, hearsay testimony, unless it is corroborated by the witness' own experience. True expert testimony, based upon an intelligent man's life, long experience, and practice, gentlemen, I charge you, is testimony in court of a very high kind, but hypothetical or supposititious expert testimony in which you argue from conclusions, not from your own experience, but simply from the experience of others, I charge you may be of the very weakest kind. It is just like circumstantial testimony. Circumstantial testimony may be the strongest testimony in the world, because circumstances cannot lie, provided you have got enough circumstances and they are of the right kind, and it may be the very weakest testimony in the world, provided you have not got enough circumstances or they are of the wrong kind. Expert testimony may be very valuable if it is based upon proper foundations, but of very little value and ·insufficient if it is based upon foundations that are insufficient and illegal. All of us know in our knowledge that 20 years ago, we could take a medical book and read the positive opinion that malaria proceeded from what they called a miasma, or bad·water; you now take a medical book, and they tell you it proceeds from neither of those causes, but proceeds from the bite of a mosquito. The same thing with yellow fever. The time was when they said diphtheria proceeded from sewer gases, and now they tell you it is a distinct infection, and our medical opinion varies, and medical books 20 years ago are now thrown

aside, and it may be quite within the limit of possibility that medical books used to-day 20 years from now will be as useless as now are those of 20 years ago. The question is what the reasonable inference, when a large number of the medical profession, in a very large number of cases, say in an enormous number of cases, may use chloral, because one physician used in perhaps not knowing his patient's physical condition with different results; to what extent does that cast upon this defendant here any presumption that he is insane?"

The knowledge of experts in any science or art would be extremely limited if it extended no further than inferences from phenomena falling within their own experience. Their testimony is admitted as valuable because based on their special knowledge, derived not only from experience, but from the experiments and reasoning of others, communicated by personal association or through books or other sources. It is more or less valuable according to the source from which it comes, but the general proposition that it is of low value unless based on personal experience is not sound.

The principle is thus well stated in 1 Wigmore on Evidence, 782, in the discussion of the reasons for the admission of evidence of physicians as experts:

"To deny the competency of a physician who does not know his facts from personal observation alone is to reject medical testimony almost in its entirety. To allow any physician to testify who claims to know solely by personal experience is to appropriate the witness stand to impostors. Medical science is a mass of transmitted data; the generalizations are rare which are the result of one man's personal observation exclusively: and the law cannot expect its petitioners to obtain these rare persons. The law must recognize the methods of medical science. It cannot stultify itself by establishing, for legal remedies, a rule never considered necessary by the medical profession itself. It is enough for a physician, testifying to a medical fact, that he is by training and occupation a physician; whether his source of information for that particular fact is in part or entirely the hearsay of his fellow practitioners and investigators is immaterial."

On this principle was based the remarks of the Supreme Court of the United States in Grayson v. Lynch, 163 U. S. 468, 16 Sup. Ct. 1064, 41 L. Ed. 230, on the competency and value of expert testimony offered in that case.

[12] Exception is taken to the following instruction:

"So, this man is assumed to know, if he knew what was chloral, what effects chloral has, but not only was he presumed to know, but he testifies that he did know, what was the dose he was instructed to take, what was his limitation. Therefore under the restrictions of those written directions he was actually advised of the dangerous character of the drug he was dealing with. Now, gentlemen, I charge you that if he disobeyed his physician directly, knowing what he was taking, and his intoxication proceeded from that, then if you find that he did it when actually intoxicated, then he is not excusable. If he followed his physician's directions strictly so far as he knew, then he would be excused, but if he disobeyed his physician, he is chargeable, from the very limitation expressed, as I construe that written direction, he is chargeable by that fact with the knowledge of the restrictions impressed upon him, and he is chargeable, therefore, with knowing that taking an excess of that was dangerous."

It is not correct to say, as a general proposition, that a man without expert knowledge is presumed to know the effect of chloral or of other drugs if he knows what it is; that is, what it is made of. In this in-

struction, however, there was no harmful error, because the defendant had express warning from the physician's prescription not to take more than a certain quantity. He knew it was a drug that would affect the nerves, and he was notified by the terms of the prescription that serious results would follow an overdose. As we have seen, unless the dose, taken in good faith under the physician's prescription, had thrown him in a state of uncontrollable delirium, he could not be allowed to take the risk of an overdose and visit the consequences on his fellow passengers. The objection to the definition of reasonable doubt is too refined.

[13] The testimony of Dr. Roberts as to the description the defendant gave of his symptoms just before going on the ship was competent on the issue of his mental and physical condition at that time.

"Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent, explanatory, or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury." Insurance Co. v. Mosley, 75 U. S. (8 Wall.) 397, 19 L. Ed. 437; Northern P. R. Co. v. Urlin, 158 U. S. 271, 15 Sup. Ct. 840, 39 L. Ed. 977; 1 Greenleaf Ev., § 102.

[14] Upon objection made to this testimony the court erroneously held it incompetent. The record indicates, however, that this was not prejudicial, as the substance of defendant's complaints to Dr. Roberts was afterwards admitted.

[15] Exception is made to the portions of the charge which allude, by way of illustration, to Thaw and his victim, Stanford White. It seems evidently better in the trial of a case to refrain from allusion to other cases, especially recent cases, which have attracted attention and elicited strong popular prejudice or sentiment. There is danger in such allusion of tying the defendant in the minds of the jury to the person referred to; and this association in the minds of the jury evidently may be prejudicial to the defendant. We do not think, however, that if there were no other error there should be such an inference of prejudice as to warrant a reversal on this ground.

[16] The alleged indication of the District Judge in his charge that he thought the defendant guilty does not furnish ground for a new trial. A large latitude is allowed to a trial judge in the federal courts in expressing his opinion to the jury, so long as he leaves the ultimate issue of guilt or innocence to their decision; and but for the errors pointed out, we are not prepared to say that the District Judge went beyond his recognized powers.

Judgment reversed.