**UNITED STATES of America**

v.

**George James HOPKINS.**

**Cr. No. 24167.**

United States District Court
D. Maryland.
Dec. 31, 1958.

Leon H. A. Pierson, U. S. Atty., and Martin A. Ferris, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Donald L. Merriman and James D. Peacock, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

Defendant is charged in a seven count indictment with stealing from authorized receptacles for mail (house letter boxes) in Baltimore, Md., on various dates between September 13, 1957 and November 2, 1957, six letters containing checks and one package containing a sterling silver picture frame. He has been ably represented by court-appointed counsel. They do not seriously dispute that Hopkins physically took the material from the mails, but contend that he was then under the influence of a mental disease, a delusion, as a result of which he lacked sufficient capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, and that his unlawful acts were the product of that disease. The case presents a question of law, what test for determining criminal responsibility should be applied, and a question of fact, whether Hopkins lacked the capacity required by the applicable rule.

### The Law

Counsel for defendant urge the adoption of the Durham rule: "It is simply that an accused is not criminally

responsible if his unlawful act was the product of mental disease or defect." Durham v. United States, 94 U.S.App.D. C. 228, 214 F.2d 862 at pages 874–875, 45 A.L.R.2d 1430. Since Durham, the Fifth, Eighth and Ninth Circuits have held that federal courts other than the courts of the District of Columbia are required by decisions of the Supreme Court to apply the M'Naghten rules [1], supplemented by an irresistible impulse test. Voss v. United States, 8 Cir., 259 F.2d 699; Sauer v. United States, 9 Cir., 241 F.2d 640, certiorari denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539; Andersen v. United States, 9 Cir., 237 F.2d 118, 126–128; Howard v. United States, 5 Cir., 232 F.2d 274, 275. See Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, and 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750; Hotema v. United States, 186 U.S. 413, 420, 22 S.Ct. 895, 46 L.Ed. 1225; Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631; Fisher v. United States, 328 U.S. 463, 466, 66 S.Ct. 1318, 90 L.Ed. 1382; Leland v. State of Oregon, 343 U. S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302; Perkins v. United States, 4 Cir., 228 F. 408.

The Durham rule has been widely discussed.[2] The reasons why it should not be adopted by other federal courts have been so well stated by Judge Barnes in Sauer v. United States, 9 Cir., 241 F.2d at pages 646–652, that it would be presumptuous for me to restate them. I will add only one item: when counsel for defendant in the instant case asked Dr. Root whether Hopkins' unlawful acts were the product of mental disease or mental defect, I refused to permit the question until the doctor told me what he understood the word "product" to mean. The doctor said that he did not know what the word was supposed to mean in the context of the question, that he assumed it was a legal term, and that he did not like it. Since Durham, the District of Columbia court has defined the term "product of" to mean essentially "result of" or "caused by"—"But for this disease the act would not have been committed." Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 617.[3]

Almost everyone who has considered the problem in recent years has recognized the importance of stating the ap-

1. "* * * [E]very man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; * * * to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." Lord Chief Justice Tindal answering the House of Lords in M'Naghten's Case, 10 Clark & Finelly 200.

2. See Sobeloff, From McNaghten to Durham, And Beyond—A Discussion of Insanity and The Criminal Law, 41 A.B.A. Journ. 793, XV Md.L.Rev. 44, and other authorities cited in the foot notes to Sauer v. United States, 241 F.2d at pages 644 to 652.

3. "When we say the defense of insanity requires that the act be a 'product of' a disease, we mean that the facts on the record are such that the trier of the facts is enabled to draw a reasonable inference that the accused would not have committed the act he did commit if he had not been diseased as he was. There must be a relationship between the disease and the act, and that relationship, whatever it may be in degree, must be, as we have already said, critical in its effect in respect to the act. By 'critical' we mean decisive, determinative, causal; we mean to convey the idea inherent in the phrases 'because of', 'except for', 'without which', 'but for', 'effect of', 'result of', 'causative factor'; the disease made the effective or decisive difference between doing and not doing the act. The short phrases 'product of' and 'causal connection' are not intended to be precise, as though they were chemical formulae. They mean that the facts concerning the disease and the facts concerning the act are such as to justify reasonably the conclusion that 'But for this disease the act would not have been committed.' " Judge Prettyman in Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 617.

plicable rules in terms which will have a clear meaning to judges, lawyers, psychiatrists and jurors. If the Durham rule is not adopted, defendant's counsel urge the court to apply the test recommended by the American Law Institute:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

· "(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Model Penal Code, Tentative Draft No. 4, sec. 4.01.

An alternative rule, favored by Professor Wechsler (the reporter) and a minority of the Institute, is as follows:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect his capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible."

An able committee of doctors, judges and others, headed by Dr. Manfred S. Guttmacher, appointed in compliance with a joint resolution of the Maryland Legislature to consider the problem, has recently made its report, recommending the following test:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks sufficient capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law * * *." [4]

The Committee also recommends that if a person is found not guilty because of insanity at the time of the commission of the crime, he should be committed to a mental institution for study and observation for a period of not less than a year, even though he is found sane at the time of the trial. The Committee feels that this provision is necessary in order to protect society from a possible recurrence of the mental disease. There is no such provision in Title 18, U.S.C. As Judge Barnes pointed out in Sauer v. United States, 241 F.2d at pages 650–652, under the Federal criminal law, as distinguished from the law of the District of Columbia, the choice "is not between confinement and commitment, but rather between confinement and freedom." Perhaps it is not inappropriate for a trial judge to recommend that Congress give prompt consideration to appropriate provisions for persons found not guilty because of insanity.

The tests proposed by the American Law Institute and the Maryland committee have much to recommend them. They meet the principal criticisms of the right-wrong test: "that (a) it does not take sufficient account of psychic realities and scientific knowledge, and (b) it is based upon one symptom and so cannot validly be applied in all circumstances." Durham v. United States, supra, 214 F.2d at page 874. They also meet the criticism of the irresistible impulse test: "that it gives no recognition to mental illness characterized by brooding and reflection and so relegates acts caused by such illness to the application of the inadequate right-wrong test." Ibid at page 874. And they meet the objections to the Durham rule stated in Sauer v. United States, supra.

When a judge is sitting without a jury he is likely to apply the alternative A.L.I. test, consciously or unconsciously. In a trial by jury an instruction based upon the rule recommended by the Maryland committee [5] would probably be the most just, in the present state of psychiatric

---

4. The word "sufficient" in the proposed Maryland rule states the intended meaning more clearly than the word "substantial" in the American Law Institute rule.

5. See note 4.

knowledge and in the present state of responsible psychiatric opinion on "irresistible impulse" and related concepts. In the case at bar, for the reasons stated below, the same conclusion would be reached whether I applied the prevailing Federal rules, either of the A.L.I. rules, or the proposed Maryland rule.

## The Facts

I. The facts in this paragraph appear from evidence offered on behalf of the defendant. He was born in 1918, in Buffalo, N. Y., had a poor school record, but reached the tenth grade, became involved in a statutory rape charge, and left school at age 15 to marry his first wife, Kay, by whom he had three children. His married life was stormy, he drank too much, his work record was poor, and he was arrested a number of times for passing bad checks and other offenses. He enlisted in the Navy in 1943. Toward the end of 1944, while stationed in the Solomons, he had a nervous breakdown which was diagnosed as "psychoneurosis, anxiety neurosis". He was returned to the States, was hospitalized on the west coast and in Newport, R. I., and received a medical discharge in May, 1945, because of a "personality disorder". He claims to have little if any memory of what happened between a visit to an oculist on Guadalcanal and his hospitalization in Newport. He returned to Buffalo, where he lived and worked until 1949, when he was arrested, charged with forgery, second degree. Released on bail, he was rearrested for another offense. After a brief period in jail during which he attempted suicide, he was sent for observation to the Meyer Memorial Hospital, where after two months his condition was diagnosed as "dementia praecox, catatonic, unimproved". On the basis of this diagnosis, the court in Buffalo found him unable to stand trial and committed him to the Buffalo State Hospital, from which he escaped after about six weeks. The doctors at the State Hospital found no evidence of any psychosis; their final diagnosis was "without psychosis, psychopathic personality with asocial and amoral trends". He was charged with committing a burglary after he had escaped, was found guilty, and sentenced to the Attica state prison for five to ten years. After four years, in 1953, he was released on parole. Meanwhile his wife Kay had divorced him, and after his release he lived with a woman named Mary. His grandmother lived with them until her death in 1955. He worked more regularly during this period, but suffered from severe headaches. In the spring of 1956, his first wife, Kay, told him that Mary had not taken proper care of the grandmother while he was out of the house. He reproached Mary for this, and a quarrel ensued, as a result of which Hopkins left the home.

From this point the facts are disputed. We must consider four periods: (I) The period before March 1956, outlined above; (II) March 1956 to January 1958, including his marriage to Ruth in May 1957, the taking of the mail in September-November 1957, his arrest in November 1957, and a visit to the U.S. P.H.S. hospital later in November 1957; (III) January 1958 to April 1958, beginning with an incident in the Baltimore City jail, followed by psychiatric treatment in the prison hospital at Lewisburg, and terminating with a long letter to Ruth dated April 29, 1958; and (IV) April 1958 to date.

II. From the spring of 1956 to the spring of 1957, Hopkins lived with a woman named Grace Waters. He worked for a while in Buffalo, but came to Baltimore in October 1956 because he had violated his parole and because his Mother and Grace wanted him to get a fresh start away from bad companions. He worked as a painter for several months in Baltimore and Grace worked as a waitress in a restaurant. In the spring of 1957 Hopkins was out of work and became friendly with Ruth, who had an apartment on the floor below. In May 1957 he married Ruth, but continued to see Grace. Beginning in September 1957, Hopkins took a considerable number of letters and packages from the mails. Some of the letters contained

checks, including the six described in the indictment. Hopkins did not cash any of the checks himself, but he shared in the proceeds of those which were cashed by Ruth and Quintella Short, a friend. Hopkins obtained and typed out a New York chauffeur's renewal license stub and·a false power of attorney to aid Ruth and Quintella in cashing the checks, and accompanied them on check-cashing expeditions. He also retained other material taken from the mails, some of which had intrinsic value and some of which would have been useful as false identification in cashing other checks. He added his name as a joint depositor on a bank book which he had taken from one of the letters.

After his arrest on November 12 he gave statements to the Post Office inspectors and to Baltimore Police Department detectives, who found him no more nervous than the average person under similar circumstances. He told his cellmates in the Baltimore City jail, one of whom had been associated with him in the check-cashing expeditions, that he expected to be sent back to prison, and discussed with them the possibility of feigning insanity to obtain institutional treatment instead. On November 17 the jail authorities found him in a state of hysteria, a trance-like state,[6] which continued for several days during which he did not eat, speak or move. On November 19 he was sent to the U.S.P.H.S. Hospital. On examination there he did not show the "waxy flexibility" characteristic of catatonic schizophrenia. He recovered consciousness when a nasogastric tube was inserted and requested that the tube be removed and intravenous injections discontinued. Thereafter Hopkins ate normally, but feigned disorientation as to time for a day or so. Dr. Mackenzie, a neuro-psychiatrist, diagnosed his condition as a "conversion reaction", from which he had a prompt recovery. Hopkins gave a history to Dr. Mackenzie covering period I as well as period II. Dr. Mackenzie found him to be an extremely immature, dependent individual, who was depressed and emotionally disturbed but legally sane. He was returned to the jail hospital.

III. Early in January 1958, following a visit to the jail by Ruth, who had pleaded guilty and been placed on probation, Hopkins threatened suicide, and was considered so seriously ill that he could not be kept in the jail hospital. Neither St. Elizabeth's Hospital nor the VA Hospital at Perry Point was able to admit him, so with the approval of his court-appointed attorney Hopkins was taken to the prison hospital at Lewisburg. There, for nine months, he received the devoted attention of Dr. Manly B. Root, the prison psychiatrist. After a number of interviews, including one under sodium pentathol,[7] Dr. Root found that Hopkins had a practically complete amnesia for period II, although he could remember what had happened in period III, beginning in January, 1958, and had some memory for what had happened in period I, before the spring of 1956. Dr. Root found Hopkins calm, courteous, sombre, concerned about his wife and about being locked up, but with no psychiatrically abnormal depression. Dr. Root believes the amnesia to be real, and that Hopkins had had several previous periods of amnesia. Dr. Root warned Hopkins that if he was found to be psychotic he might be kept in a psychiatric institution longer than he would be kept in prison if convicted. Dr. Root obtained permission for Hopkins to work as an inmate; he worked well and was well liked.

On February 21, 1958, Dr. Root reported to counsel for the government and for the defendant that, in his opinion, Hopkins was not psychotic but was not able to assist in his defense because of a psychoneurotic dissociative reaction of the hysterical type. He felt that Hopkins had had at least two personalities: one from the spring of 1956 to January 1958, and another from January 1958 on, and that the latter did not know what the former had done. He felt then that

---

6. Described by his cell-mates as a "flip out".

7. Popularly called "truth serum".

Hopkins was sane and responsible for his acts in both personalities, but because of an hysterical amnesia was unable to assist in his defense.

Dr. Root continued his interviews and treatments. Hopkins began to regain his memory for period II, and in the latter part of April he wrote a long letter to his wife Ruth, which purported to give a detailed account of events during period II, which Hopkins said he had just recently been able to remember. He knew that Dr. Root would read the letter, and in the letter he asked Ruth to show it to his attorney. Dr. Root considered that the recovery of memory evidenced by the letter was a partial synthesis of the two personalities and represented a return to the personality which was normal for Hopkins.

IV. In the letter of April 29, 1958, Hopkins wrote that in March 1956 he had reproached Mary for not taking proper care of his grandmother; Mary thereupon told him that they were not man and wife, that she was married to a man named Hammond, and that "their" child was Hammond's; Hopkins went to Cleveland, confirmed her relationship with Hammond, returned to Buffalo, and a quarrel ensued which culminated in Mary telling him to get out and throwing a suitcase filled with clothes down a flight of steps to where Hopkins was standing on the floor below; that the suitcase opened and the clothes flew out, hitting Hopkins in the face, and causing him to feel that he was being choked; a period of amnesia followed, during which he wandered through the streets and was picked up by Grace Waters, who took him to her apartment, told him something about himself, and gave up her job to live with him; he blamed his troubles on Hammond; Grace persuaded him to come to Baltimore and work as a painter, for which he was not fitted, and lived with him off his wages in various apartments in Baltimore; he did not know who he was except for what Grace told him. The letter continues that after he and Ruth were married they made a deposit on account of rent for an apartment but called off the deal and were supposed to receive a refund of $30, a check for which was to be mailed to their old apartment. The check did not arrive although Hopkins looked for it in their old mail box and in other boxes. The letter states that he had believed Hammond was responsible for his not receiving the check, that he started to take letters from mail boxes under the delusion that Hammond had caused the checks to be made out in other names, and that he felt that if he could get in touch with Hammond he could stop the choking sensation. He blames Grace for keeping this feeling stirred up and for playing on his fear of being returned to a mental institution in Buffalo. He reiterates the statements he had previously made that Ruth was not responsible for the thefts.

After further interviews with Hopkins Dr. Root became convinced that the statements made in the letter of April 29 were true and should be accepted as established facts, despite conflicting statements made by Hopkins to the Post Office inspectors and Baltimore detectives shortly after his arrest in November 1957, and despite the facts and the opinions contained in the U.S.P.H.S. Hospital record of his November 1957 admission.

A psychiatric report was prepared by Dr. Leslie R. Angus, a consulting psychiatrist, which was also signed by Dr. Root and by Dr. Leon A. Witkin, the chief medical officer at the hospital. This report, dated August 15, 1958, was the basis for most of Dr. Root's testimony at the trial. The doctors concluded that on the basis of the information available, the differential diagnosis lay "between (1) a psychopathic personality without further complications, (2) a psychoneurotic dissociative state, (3) a frankly psychotic episode, and (4) a complication of the first with either of the other two". The doctors were "inclined to consider" this to be a case of psychopathic personality, with a psychotic episode of the schizophrenic type, the psychotic phase having passed.

The opinions of the doctors, including those expressed by Dr. Root on the witness stand, were based upon the assumption or belief that certain facts found by Dr. Root had been "established". Those assumed facts were set out in seven numbered paragraphs in the report of August 15, as follows:

"1. In March, 1956, Hopkins, after the episode of the suitcase being thrown at him, lost completely, all memory of his former life, even his identity. This state of mind, during which he was James Hopkins or James Waters, according to whatever Grace Waters told him from time to time, continued throughout the events of his life in Buffalo after March, 1956; and his life in Baltimore, the latter including the entire period during which the checks were stolen and cashed.

"2. The letters were stolen and the checks endorsed by him during this period of amnesia for his former life, but with perfect memory for the events of his Baltimore life. The letters were stolen under the influence of the pathological belief that in getting these letters and checks cashed he would prevent Donald Hammond from leaving Baltimore, and would have some chance to find Hammond and thus relieve Hopkins of the fear and choking sensations which had tortured him ever since the first suitcase was thrown at him by Mary.

"3. None of the checks were cashed by Hopkins' wife, Ruth; by Grace Waters; and in the case of the largest check, by Ruth and Quintella Short.

"4. The motives of Ruth and Grace and Quintella are not properly subject matter of this report. But these three women appear to have been motivated by desire for money. Hopkins' motives, on the other hand, appear to have had nothing to do with desire for money (except for getting back the downpayment Ruth had made on the apartment), but

merely to keep Hammond in Baltimore and to try and make contact with him in response to Hopkins' delusional or obsessional fear of Hammond and the belief that contact with Hammond would result in cessation of the choking sensations."

Paragraphs 5, 6 and 7 deal with the period after arrest.

Dr. Root testified that in his opinion the theft of the checks was motivated by the desire to find Hammond and not by any desire for gain; that when Hopkins took the checks he was under the delusion that Hammond had written the checks under other names, and that by finding Hammond the choking sensation would be stopped; he was, therefore, unable to resist the desire to take the checks. If asked whether it was wrong, Hopkins would have said "yes", but he was so controlled by his delusion, so anxious to get hold of Hammond, that the question of right and wrong would not enter into it. Dr. Root also testified that in his opinion Hopkins' mental disease was such that he lacked sufficient capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. He said that in his opinion Hopkins was psychotic at the time of the offense; that he is now in a period of remission, but the schizophrenic state may return in any period of shock or strain.

Dr. Root testified that his change of opinion between February and August was due to the letter of April 29; that he believes Hopkins had no profit motive in taking the checks, and that Hopkins gave in about the cashing. He conceded that if Hopkins had the idea of cashing the checks, he would have to reconsider his opinion seriously, and that if it were found as a fact that Hopkins had boasted of malingering and feigning, that also should be considered.

Dr. Philip F. Lerner, a Baltimore psychiatrist, examined all of the medical reports referred to above and saw Hopkins once, just before the trial. Based upon his evaluation of those reports, he agreed with the conclusion set out in the report

of August 15, that this is a case of a psychopathic personality with psychotic episodes of the schizophrenic type. He testified that at the present time Hopkins does not show any evidence or any form of psychosis or mental disease, but that in his opinion at the time of the offenses Hopkins was in a psychotic phase in which he had a different personality and was under a delusion which frightened him and affected his will power, causing him to do things he would not otherwise have done. Dr. Lerner could not say whether Hopkins knew that what he was doing was wrong, but was of the opinion that Hopkins could not conform his conduct to the requirements of the law, could not control his impulses to take the checks, and that those unlawful acts were the product of his mental disease.

The opinions of Dr. Root and Dr. Lerner were based upon the statements made by Hopkins in the letter of April 29, in his interviews with Dr. Root, and in his interview with Dr. Lerner, all of which were admitted in evidence without objection by the government. If the facts upon which those opinions were based are the true facts, the opinions of the doctors would create a reasonable doubt of defendant's guilt. Those facts, assumed by all of the doctors to be true, are set out in the numbered paragraphs of Dr. Root's report of August 15, 1958, quoted above. I do not question Dr. Root's belief that those facts have been "established" by appropriate psychiatric techniques in his interviews with Hopkins following the letter of April 29, despite the evidence pointing the other way in some of the material submitted to him. But it is the responsibility of the *court* to determine the true facts from all of the evidence, giving due weight to the statements made by Hopkins which were accepted by Dr. Root and Dr. Lerner, but considering also the evidence which contradicts some of those statements and assumptions, much of which was not available to Dr. Root and Dr. Lerner when they formed their opinions.

It will be convenient to consider two by two the paragraphs quoted above from Dr. Root's report: 1, 2. There is no evidence confirming the episode of the suitcase being thrown at Hopkins by Mary, or confirming his statement that he lost all memory of his former life, even his identity, and that such state of mind continued during his entire life in Baltimore, including the period during which the checks were stolen and cashed. On the other hand, Grace Waters, who lived with him for more than a year during that period, and who has maintained friendly relations with Hopkins and Ruth, testified that Hopkins knew who he was, knew about his past life, and acted on motives which to me seem rational if not admirable. Moreover, Hopkins gave statements concerning his past life to the postal inspector and to Dr. Mackenzie during November 1957, a few days after the last check was taken. There is no evidence which confirms Hopkins' statements that the letters were stolen under the influence of any delusion about Donald Hammond or in order to relieve Hopkins of any fear or choking sensation. Aside from the fact that there is a man named Donald Hammond in Buffalo, there is no testimony or other evidence which connects Hammond with Hopkins or Mary, and no evidence that Hopkins ever mentioned Hammond[8] or any choking sensation to anyone during the entire period March 1956 to December 1957. Grace and Ruth lived with him for months and Quintella and Jim Ginnamon also stayed in his apartment for a few days during that period. The government could not call Ruth, his wife, but did call Grace, Quintella and Jim, as well as Dr. Mackenzie, the postal inspector and the Baltimore detective. The defense did not call Ruth, although she was present in court, and it may be inferred that her testimony would not have helped the defense.

3, 4. The evidence does not support Dr. Root's belief that Hopkins' motives had nothing to do with the desire for

8. The statement of a cell-mate that Hopkins muttered something that sounded like "Hinmon" in his sleep is inconclusive, since Ginnamon was a cell-mate.

money. It is true, as Dr. Root notes, that the checks were cashed by Ruth and Quintella, probably with some help from Grace, but the evidence convinces me beyond a reasonable doubt that Hopkins instigated the cashing of the checks. He received some or all of the proceeds of the checks that were cashed. He procured the chauffeur's renewal license blanks, he filled in the form used by Quintella to cash the largest check, he prepared a false power of attorney to assist in cashing another check, and he kept not only the checks but other personal property which he took from the mails. He added his name to a passbook he had taken from one of the letters. The defense does not contend that any delusion or fear required him to do any of these acts.

In fairness to the doctors, it should be noted that they did not have the benefit of the testimony of the witnesses who testified in open court, and Dr. Root conceded that if certain facts were established he would have to review his opinion. It is true that the testimony of Grace, Quintella and Jim must be scrutinized carefully. Grace denied writing a signature which I find she did write on the back of a check not involved in this indictment, but skillful cross-examination did not show that any of them bore any resentment against Hopkins or lied about his activities. There is no reason to doubt the evidence of the postal inspector, the City detective, Dr. Mackenzie, or any of the other doctors who made out the record at the U.S.P.H.S. Hospital. None of these people testified to anything tending to show that Hopkins was laboring under the claimed delusion. On the other hand, the U.S.P.H.S. Hospital record supports the testimony of Hopkins' cell-mates at the jail that he intended to feign insanity.

Dr. Root testified: "I must consider it in this way, that there have been three Hopkinses: The first one is the one in which he appears here now, and he was that Hopkins in my opinion up to about March 1956. That is number one, a re- latively normal Hopkins, somber and well-intentioned, willing to work and anxious to please, and non-delinquent in any way." The facts found in paragraph I, under the heading "The Facts", supra, do not bear out Dr. Root's assumption that the "relatively normal Hopkins", as he was up to about March 1956, was "non-delinquent in any way". To the contrary, his record prior to March 1956 casts serious doubt upon the credibility of the statements which he made to the doctors. I am not satisfied beyond a reasonable doubt that Hopkins was malingering, but I am satisfied beyond a reasonable doubt that the facts upon which the doctors based their opinions are not the real facts.

 No doubt Hopkins has a psychopathic personality; no doubt he has had periods of amnesia; and it may be that during some of those periods he passed from a psychoneurotic into a psychotic state. It may be that Hammond exists and that Mary hid from Hopkins her marriage to him; it may be that the suitcase incident is true and produced a period of amnesia. It may be that when Grace threw his clothes downstairs to him it brought on another brief period of amnesia. It may be that he started to look into mail boxes in search of a rent refund check for $30. I do not find that everything in the letter of April 29 is false. Neither do I find that everything in it is true. I am satisfied beyond a reasonable doubt that the taking of the checks was motivated by a desire for gain and was not the result of a delusion or a psychosis.

I find as a fact that at the time Hopkins took the checks from the mails he understood the difference between right and wrong and had sufficient mental capacity to appreciate the criminality of his conduct. I also find that the taking of the letters from the mails was not the result of an irresistible impulse or of any mental disease or defect which robbed him of the capacity to conform his conduct to the requirements of the law.

Conclusion

I am convinced beyond a reasonable doubt that the defendant is guilty of the offenses with which he is charged in the indictment.