**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 9, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.                                                              No. 24-7022

ROBERT WILLIAM RAINFORD,

  Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:22-CR-00003-JFH-1)**
_____

Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Kevin Gross, Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **CARSON**, and **FEDERICO**, Circuit Judges.
_____

**FEDERICO**, Circuit Judge.
_____

  Mark Rainford and Trent Scroggins were friendly next-door neighbors in Muskogee, Oklahoma. They had no history of conflict. But one morning,

Rainford knocked on the back door of Scroggins' house. Scroggins, expecting an amiable chat, said hello and then went out to his patio to show Rainford his rock garden. Once outside, Rainford shot Scroggins ten times in the back. Scroggins' stepson watched from the window as Rainford shot his stepfather and then stood over his lifeless body cursing at him. After he was arrested, Rainford told the police that Scroggins had molested Rainford's daughter, so he shot him to protect her. In reality, Scroggins had never done anything inappropriate to Rainford's daughter.

Rainford was examined by a Bureau of Prisons (BOP) psychologist who concluded that he suffered from paranoid delusions and was psychotic when he shot Scroggins. In the months leading up to the shooting, Rainford had been prescribed exceedingly high doses of the prescription amphetamine Adderall. The BOP psychologist determined that this prescription caused amphetamine-induced psychosis.

At trial, Rainford raised involuntary intoxication from his Adderall consumption as an affirmative defense. The jury was instructed on involuntary intoxication, but they were told that Rainford could not have been involuntarily intoxicated if he had knowledge of Adderall's possible intoxicating effects or if he had used illegal drugs while on Adderall. Rainford also requested an instruction on involuntary manslaughter for imperfect defense of another, but this instruction was denied.

2

The jury rejected Rainford's defense and convicted him of first-degree murder. On appeal, Rainford argues that the jury was improperly instructed on the defense of involuntary intoxication, that he was improperly denied an instruction on involuntary manslaughter based on the imperfect defense of another, and that the district court abused its discretion by giving a limiting instruction to the jury after the defense's closing argument. We agree that the instruction on involuntary intoxication was legal error, so we reverse Rainford's conviction and remand to the district court for a new trial on this basis.

## I

### A

At the time of his offense, Rainford was a 49-year-old long haul truck driver living with his 13-year-old daughter. In August 2021, Rainford and his daughter moved to a house in Muskogee, Oklahoma next to Scroggins and his family. According to members of Scroggins' family, the two neighbors were on good terms and never had any conflict.

While he was living in Muskogee, Rainford was taking high doses of the prescription amphetamine Adderall. From 2019 through 2020 he was prescribed 60 mgs of Adderall per day as a treatment for attention-deficit/hyperactivity disorder (ADHD). The maximum recommended dose of Adderall is 60 mgs per day. In September 2020, he began seeing a new

doctor who substantially increased his Adderall dosage. Rainford was prescribed 90 mgs per day, which was then increased to 120 mgs per day in March 2021. At the same time, Rainford's new doctor prescribed additional 30 mg tablets of extended-release Adderall for Rainford to take as needed. For most of 2021, Rainford was taking Adderall as prescribed at twice the recommended limit.

On the morning of December 12, 2021, Rainford knocked on the back door of Scroggins' house. Scroggins answered the door and greeted Rainford, who responded "[h]ey[.]" R. III at 267. Scroggins then went out the door to his patio intending to show Rainford his outdoor rock garden. Then, while Scroggins was turned around, Rainford shot him in the back. After Scroggins fell to the ground, Rainford continued to shoot him. Autopsy results later revealed that Scroggins was hit by ten bullets: three in the head, three in his arms, and four in his torso. After shooting Scroggins, Rainford stood over his body and cursed at him before eventually leaving.

Scroggins' stepson watched the shooting unfold from a window and ran to get his mother, who then called the police. When the police arrived, they found Rainford hiding behind a tree in front of his house. As he was being arrested, Rainford told the police that Scroggins had raped his daughter. After Rainford was arrested, police searched his home for

4

weapons and found a pistol and a rifle. A later search of the home under a valid warrant also uncovered Rainford's journal.

That same day, Rainford waived his rights and agreed to talk with investigators. During the interrogation he stated several times that Scroggins had been inside his house. When Rainford was asked why he didn't shoot Scroggins while he was inside his house, he responded "I think I did, probably." Ex. 119 at 25:35–25:40. A few minutes later he said, "this guy's just been in my house, molested my daughter and I just made it stop. Period. He's in my house, I did what I had to do." *Id.* at 30:06–30:17. When an interrogator then asked what he had done, Rainford said he "defended [his] daughter[.]" *Id.* at 30:19.

After the interview ended, Rainford said that he was feeling unwell and requested to go to the hospital. Rainford was taken to Saint Francis Hospital in Muskogee, where he was seen by doctors and discharged the same day. A doctor's notes from the hospital stated that "[Rainford] states his last use of methamphetamine was today; however does state [sic] that he has a prescription for amphetamine." R. III at 491. The hospital also took a urine sample to conduct a urinalysis test for controlled substances. At first, Rainford refused to give a urine sample, but he eventually relented when told that he would need to be catheterized if he continued to refuse. Rainford tested positive for amphetamines, but the test was not able to

5

differentiate between methamphetamine and legally prescribed amphetamines.

**B**

Rainford was indicted by a grand jury and charged with the following crimes: Count One, Murder in Indian Country under 18 U.S.C. § 1111(a) and §§ 1151 and 1152; Count Two, Use, Carry, Brandish, and Discharge of a Firearm During and in Relation to a Crime of Violence under 18 U.S.C. § 924(c)(1)(A); and Count Three, Causing the Death of a Person While Knowingly Using, Carrying, or Brandishing a Firearm During and in Relation to a Crime of Violence under 18 U.S.C. § 924(j). Rainford stipulated to the fact that Scroggins was an Indian and the offense took place in Indian Country.

Before trial, Rainford's mental health became a focus of the litigation. First, Rainford moved for a competency evaluation, and a BOP psychologist, Dr. Lesli Johnson, evaluated him and opined that he was competent to stand trial. The district court found him competent to stand trial.

Then, after Rainford filed a notice that he intended to assert insanity as a defense, the Government moved the court to order a mental examination under 18 U.S.C. § 4242 to determine whether he was insane at the time of the offense. The court granted the motion. Rainford was seen and evaluated by Dr. Johnson again, who concluded that Rainford was

6

legally insane at the time of the shooting because of involuntary intoxication due to amphetamine-induced psychotic disorder. Dr. Johnson opined that Rainford shot Scroggins because of persecutory delusional beliefs that Scroggins was harming his daughter, and Rainford was unable to appreciate the criminality of his conduct while in a psychotic state.

## C

A five-day jury trial was held in May 2023. At trial, the facts of the shooting were not contested. Rainford also acknowledged that there was no evidence that Scroggins had ever been inside Rainford's house or harmed his daughter. Instead, Rainford asserted the affirmative defense of involuntary intoxication, arguing that the excessive doses of prescribed Adderall he consumed made him psychotic to the point that he could not appreciate the wrongfulness of his actions. On this point, the Government and the defense presented divergent evidence, and they continue to contest the facts and this evidence on appeal.

Rainford presented expert testimony to demonstrate that his prescription had made him psychotic. One of these experts was Dr. Johnson, the BOP psychologist who had initially found Rainford competent to stand trial but also opined he was legally insane at the time of the shooting. Because Dr. Johnson is employed by the federal government at the BOP, the Government raised concerns that the defense might bolster her

testimony by presenting her as the court's expert. The district court told Rainford's defense counsel that he could refer to Dr. Johnson as working for BOP, but that the court did not "want some implication that she's the [c]ourt's expert" or the Government's expert "because that's misleading and confusing to the jury." R. III at 100.

In her testimony, Dr. Johnson told the jury that a high dose of Adderall can cause "psychotic symptoms" that can "compromise [one's] ability to distinguish right from wrong." *Id.* at 620. She reiterated her earlier finding that Rainford appeared to be experiencing psychotic delusions, and that these were caused specifically by his Adderall use. Rainford firmly believed his delusions to be true, so he had no reason to attribute them to his consumption of Adderall. Dr. Johnson also testified that Rainford's behavior was not consistent with doctor shopping (i.e. looking for a doctor specifically to prescribe him greater doses of a drug) but rather an earnest attempt to find a medical provider closer to home.

The defense also called its retained expert, Dr. Jason Beaman, a forensic psychiatrist at Oklahoma State University. Dr. Beaman testified that Rainford's prescribed dose of Adderall exceeded the recommended guidelines, and that if someone were prescribed 120 mgs of Adderall he would "expect them to become psychotic." *Id.* at 757. And, like Dr. Johnson, he interviewed Rainford and determined based on those interviews that

Rainford had been psychotic. Dr. Beaman also stated that Rainford did not appear to be doctor shopping and had relied on his doctor's advice in good faith. He placed the blame on Rainford's doctor for prescribing overly high doses of Adderall and not stopping those doses when Rainford showed symptoms of psychosis.

The defense also relied on lay witness testimony as evidence that Rainford had been exhibiting signs of psychosis. Rainford's parents testified that, in the months leading up to the shooting, Rainford had a change in behavior and became increasingly paranoid, and that at one point they considered putting him in a mental health facility. Rainford himself also testified to a series of paranoid delusions, such as believing that someone was breaking into his house and rearranging things. Scroggins' wife reported that she sometimes heard Rainford "sitting out in his yard or porch mumbling" even when "[t]here was nobody there that he was talking to[.]" *Id.* at 285. Scroggins' stepson also testified that Rainford had been acting strange when he approached Scroggins' door the morning of the shooting. Police reported that during Rainford's arrest he was saying things that "didn't really seem relevant to what was happening." *Id.* at 302.

In contrast, the Government framed Rainford as a man "who didn't have ADHD; who didn't need Adderall; who was a longtime user and abuser of psychotropic drugs, including Adderall, and knew the effects of those

9

drugs, and knew how to abuse those drugs; and who maybe didn't even take Adderall" on the day of the offense. *Id.* at 1454.

The Government argued that Rainford sought out Adderall not for therapeutic reasons, but to abuse it as a stimulant and bodybuilding aid. In 2018, Rainford asked a friend nicknamed Tiny "where to acquire" Adderall. *Id.* at 986. Then, Rainford wrote in his journal "20/20 milligrams Adderall – Tiny." *Id.* at 353. In another entry, Rainford wrote that he took "[1]80/200 milligrams of Adderall . . . with prescribed amount of 120 milligrams." *Id.* The Government argues that these entries show Rainford was taking more Adderall than prescribed, though Rainford counters that these entries were consistent with Rainford's prescription for additional extended-release Adderall that he could take as needed. Rainford's ex-wife also testified that Rainford had a history of abusing Adderall and obtaining it from non-prescription sources. The Government further questioned whether Rainford even had ADHD that would justify an Adderall prescription in the first place.

The Government also pointed to evidence that Rainford had used methamphetamine the day of the shooting. The doctor who saw Rainford at the hospital in Muskogee wrote that Rainford said he had taken methamphetamine that day. Although the doctor did not remember the patient interaction with Rainford at trial, he testified that he would have

10

distinguished methamphetamine and legal amphetamines in his notes and records. On this point, Rainford sharply contests that he ever used methamphetamine, noting that he was regularly drug tested as part of his work as a truck driver and that searches of his home found no evidence of drug use.

The Government's argument was also supported by testimony from its own expert, Dr. Michael Arambula, a forensic psychiatrist and former President of the Texas State Medical Board. Before his testimony, the district court informed the jury that the Government had requested that Dr. Arambula interview Rainford, but that Rainford refused. Dr. Arambula told the jury that, on his review of the record, Rainford seemed to be functioning fine on his prescribed dose of 120 mgs of Adderall. He attributed Rainford's feelings of paranoia to "taking more Adderall than prescribed" and using methamphetamine. *Id.* at 1263–64. He also stated that the pattern of Rainford's prescription refills showed he was filling them early, a sign that "he wasn't taking [Adderall] as prescribed." *Id.* at 1268.

The Government also argued that regardless of the details of Rainford's drug use, he was not psychotic at the time of the shooting. The Government pointed to testimony from the officers who arrested Rainford stating that he appeared to be lucid and not under the influence of drugs. In Rainford's interview after the shooting, he was able to speak calmly and

coherently about the shooting. Likewise, the doctor who saw Rainford at the hospital did not see any obvious signs of psychosis.

The Government also highlighted evidence that Rainford was made aware of the risks of taking Adderall. Rainford's doctor gave him a general warning about the potential mental health risks of using Adderall, and Rainford's Adderall prescription forms included a monograph with warnings about the drug's side effects. Rainford stated that he told his doctor about some of his paranoid fears on a follow up appointment, and that his doctor mentioned it could be psychosis from the medication, although Rainford testified that he did not understand what that meant.

### D

Three trial objections regarding jury instructions are raised before us on appeal. First, prior to closing arguments, the district court gave the jury an instruction on involuntary intoxication. Part of these instructions listed a set of circumstances where involuntary intoxication could not be found. These included "where [Rainford] was using Adderall along with illegal drugs like methamphetamine" and "where [Rainford] had knowledge or should have had knowledge based on warnings or prior experience, of the possible intoxicating effects of Adderall." R. I at 395. Defense counsel objected to this portion of the instruction but was overruled by the district court.

12

Second, Rainford asked the district court to instruct the jury on involuntary manslaughter based on the imperfect defense of another. Rainford's theory was that he was in such a state of psychosis that he subjectively, though unreasonably, believed he shot Scroggins inside his house to protect his daughter from immediate harm. The district court ultimately declined to issue this instruction, stating that any subjective beliefs required for imperfect defense of another would require a finding of involuntary intoxication, which would independently result in acquittal.

Finally, Rainford raised an objection to a limiting instruction given after defense counsel's closing argument. During his closing, defense counsel acknowledged that one of Rainford's experts, Dr. Beaman, was hired by the defense. Defense counsel then stated, "[i]t's important to get this right. So because of that, I'm very glad that the [c]ourt appointed a second evaluator just to make sure, right? . . . So they appointed Dr. Johnson, and she works for the Department of Justice Bureau of Prisons, not defense expert, not the prosecution's expert. She's the court's expert." R. III at 1508. After continuing for several sentences, defense counsel corrected himself by stating, "[o]h, I'm sorry. Not the court's expert. I apologize if I said that. She is not defense's expert, not the prosecutor's expert, not the court's expert. My mistake." *Id.* at 1509.

13

After the defense's closing argument ended, the district court invited counsel to a sidebar where she admonished defense counsel for violating her pretrial ruling. Defense counsel pointed out that he had corrected himself, but the district court stated that his "low and dismissive correction of saying, [o]h, yeah, it's not the [c]ourt's expert is not sufficient for that level of a pretrial violation." *Id.* at 1544. After hearing defense counsel's objection, the district court gave the following instruction to the jury:

> Ladies and gentlemen of the jury, Dr. Johnson is not the [c]ourt's expert. Dr. Johnson was not appointed by the [c]ourt to make sure defendant's expert got anything right . . . [C]ounsel for the defendant [ ] was specifically told by me not to misrepresent to the jury that Dr. Johnson is the [c]ourt's expert. [Defense counsel] violated that specific court order in his closing by telling you incorrectly that Dr. Johnson is the [c]ourt's expert hired to ensure defendant's expert got things right. That is untrue.

*Id.* at 1548–49. On appeal, Rainford challenges the portion of this instruction that told the jury that defense counsel violated a court order.

### E

The jury ultimately found Rainford guilty on all three counts. The jury rendered its verdict in a general verdict form. As to the homicide, the jury found Rainford guilty of first-degree murder and not the lesser included offense of second-degree murder. As for the firearm counts, the Government made an unopposed post-conviction motion to vacate Rainford's conviction for Count Three (causing the death of another while knowingly using a

14

firearm during a crime of violence) as multiplicitous of the conviction for Count Two (knowingly using a firearm during a crime of violence). Rainford was sentenced to life imprisonment on Count One and a consecutive term of ten years imprisonment on Count Two. Rainford then timely appealed the judgment and his conviction, which we have jurisdiction to review pursuant to 28 U.S.C. § 1291.

## II

All three issues raised on appeal concern the district court's instructions to the jury. "We review the jury instructions de novo to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." *United States v. Alcorn*, 329 F.3d 759, 764 (10th Cir. 2003) (quoting *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003)). However, "the district court's decision to give a particular jury instruction is reviewed for abuse of discretion." *Id.* (quoting *Fredette*, 315 F.3d at 1241). We thus "review for abuse of discretion a trial court's decision whether to instruct on a lesser included offense[.]" *United States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014). In reviewing instructions for error, we ask "whether the jury, considering the instructions as a whole, was misled." *United States v. Woodmore*, 127 F.4th 193, 209 (10th Cir. 2025) (internal quotation marks omitted). "If we determine that the district court

erred in instructing the jury, 'instructional errors are subject to harmless error review.'" *Id.* at 210 (quoting *United States v. Benvie*, 18 F.4th 665, 670 (10th Cir. 2021)).

## III

Our primary consideration to decide this appeal is whether the district court's instructions as to involuntary intoxication were correct. We begin by examining the background of involuntary intoxication as a common law affirmative defense. We then apply our limited precedents on involuntary intoxication to the two contested portions of the district court's jury instructions and conclude that the district court erred. Next, we determine that this error was not harmless, so it warrants reversal of Rainford's convictions and remand for a new trial. As to the second instructional issue, because it may arise again at a retrial, we explain why we find error in the district court's reasoning for failing to give an instruction for imperfect defense of another. Finally, we briefly touch upon the third argument raised by Rainford on appeal, though we do not decide it because we determine that a new trial is necessary based on the first error.

## A

### 1

"The defense of involuntary intoxication has received relatively little attention from the federal courts." *United States v. Bindley*, 157 F.3d 1235,

16

1241 (10th Cir. 1998). Although we implicitly recognized its existence in *Bindley*, we did not "formulate a comprehensive definition of the defense[.]" *Id.* at 1242. Involuntary intoxication has been codified as an affirmative defense by many states, *see* 73 A.L.R. 3d 195 (1976), and the Model Penal Code, Model Penal Code § 2.08, but it has not been incorporated into federal law by an act of Congress.[1]

Federal crimes "are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985). However, the Supreme Court has recognized "that Congress 'legislates against a background of Anglo-Saxon common law' and thus 'may' have contemplated" the existence of affirmative defenses not expressly written into a statute. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 490 n.3 (2001) (quoting *United States v. Bailey*, 444 U.S. 394, 415 n.11 (1980)); *see also United States v. Serawop*, 410 F.3d 656, 662 (10th Cir. 2005). As such, "we are required to effectuate" the involuntary intoxication defense "as Congress may have contemplated it in the context of

---

[1] Involuntary intoxication has, however, been recognized under military law as a defense adopted by a Rule for Court-Martial that broadly defines the existence of affirmative defenses under the Uniform Code of Military Justice. *United States v. MacDonald*, 73 M.J. 426, 434 (C.A.A.F. 2014).

these specific offenses[.]" *Dixon v. United States*, 548 U.S. 1, 12 (2006) (internal quotation marks omitted).

"There is no evidence in the [] structure or history" of 18 U.S.C. § 1111(a) and 18 U.S.C. § 924(c)(1)(A) showing "that Congress actually considered the question of how the [affirmative] defense should work in this context, and there is no suggestion that the offenses at issue are incompatible" with involuntary intoxication. *Id.* at 13 (assuming without deciding that duress was available as an affirmative defense to federal firearms offenses). Thus, we must look to historical common law and a variety of state and federal sources to interpret the nature of the defense as Congress may have contemplated it. *Id.* at 13–16.

At common law, voluntary intoxication was not a defense to a crime. *See Montana v. Egelhoff*, 518 U.S. 37, 44–46 (1996) (discussing the common law history of voluntary intoxication). But involuntary intoxication, produced through no fault of the defendant, was different. A 1778 edition of the legal treatise The History of the Pleas of the Crown by Sir Matthew Hale stated,

> That if a person by the unskilfulness of his physician, or by the contrivance of his enemies, eat or drink such a thing as to causeth such a temporary or permanent phrenzy . . . this puts him into the same condition, in reference to crimes, as any other phrenzy, and equally excuseth him [sic].

1 M. Hale, History of the Pleas of the Crown *32 (George Wilson ed. 1778). This principle continued to be recognized by courts in England and the United States through the 19th Century. *See Pearson's Case* (1835) 168 Eng. Rep. 1108

18

(NP) ("If a party be made drunk by stratagem, or the fraud of another, he is not responsible."); *Choice v. State*, 31 Ga. 424, 472 (Ga. 1860) ("For drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, artifice or contrivance of another."). Voluntary and involuntary intoxication were treated differently because a defendant who was involuntarily intoxicated had no part in bringing about the mental state that caused him to commit a crime. *See generally* Lawrence P. Tiffany, *The Drunk, the Insane, and the Criminal Courts: Deciding What to Make of Self Induced Insanity*, 69 Wash. U.L.Q. 221 (1991). When Congress codified murder as an offense it did so against a common law background that accepted the affirmative defense of involuntary intoxication.

Involuntary intoxication is a complete defense "because intoxication affects the ability to distinguish between right and wrong." *United States v. F.D.L.*, 836 F.2d 1113, 1116 (8th Cir. 1988). In this sense, it is closely related to the defense of insanity and has been described as a form of temporary

19

insanity.[2] *See People v. Low*, 732 P.2d 622, 627 (Colo. 1987); *Gilcrist v. Kincheloe*, 589 F. Supp. 291, 294 (E.D. Wash. 1984), aff'd, 774 F.2d 1173 (9th Cir. 1985). But involuntary intoxication is not identical to an insanity defense. Involuntary intoxication simply uses the same standard as insanity for the defendant's necessary mental state during the commission of the crime. *See F.D.L.*, 836 F.2d at 1117 ("[T]he mental state of an involuntarily intoxicated defendant is measured by the test of legal insanity."); *see also* 1 Wharton's Criminal Law § 16:4. Involuntary Intoxication (16th ed.) ("The defendant, if successful, is not regarded as 'insane'; an insanity test is merely used to determine whether he should be deemed criminally responsible."). A defendant who is involuntarily intoxicated must be so greatly intoxicated that he, like an insane defendant, is "unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a).

In *Bindley*, we recognized four forms of involuntary intoxication:

(1) where the intoxication was caused by the fault of another (i.e., through force, duress, fraud, or contrivance); (2) where the intoxication was caused by an innocent mistake on the part of the

_____

[2] Unlike involuntary intoxication, insanity is expressly recognized as an affirmative defense by federal statute. 18 U.S.C. § 17. The Government has noted that it does not concede that involuntary intoxication is even available as a federal defense distinct from insanity, but it does not expressly argue that it is unavailable. Any argument that involuntary intoxication is not recognized under federal law is thus inadequately developed, especially since that argument would conflict with our recognition of the defense in *United States v. Bindley*. 157 F.3d 1235, 1241 (10th Cir. 1998).

defendant; (3) where a defendant unknowingly suffers from a physiological or psychological condition that renders him abnormally susceptible to a legal intoxicant (sometimes referred to as "pathological intoxication"); and (4) where unexpected intoxication results from a medically prescribed drug.

157 F.3d at 1242; *see also Sallahdin v. Gibson*, 275 F.3d 1211, 1236 (10th Cir. 2002) (describing the same four categories in reference to Oklahoma state law). While *Bindley* concerned the second category, this case falls into the fourth category: unexpected intoxication from a medically prescribed drug. This form of involuntary intoxication dates back to Hale's description of the "unskilfulness of [a] physician" that "causeth such a temporary or permanent phrenzy [sic] [.]" 1 Hale, *supra*, at *32.

In federal court, this defense was first discussed by the Fourth Circuit in the 1915 case *Perkins v. United States*. 228 F. 408 (4th Cir. 1915). In *Perkins*, a defendant was convicted of manslaughter for shooting another passenger aboard a ship with no apparent motive. *Id*. at 412. He raised as a defense "insanity, caused by the use of alcohol and drugs[,]" specifically a prescription for chloral hydrate given to him by his doctor as a sedative. *Id*. at 413. The court held that if the defendant "was so frenzied by a portion of the medicine innocently taken under the direction of the physician that he was thrown into a mental state which placed him beyond his own control and beyond the

21

realization of what might be the ill effect of an overdose, he would not be legally responsible." *Id.* at 416.

Although involuntary intoxication is recognized in our case law, we acknowledge that there was little to guide the district court when crafting an instruction for the jury. Indeed, it is "difficult to formulate a comprehensive definition of" involuntary intoxication because it can apply in such "widely varying circumstances[.]" *Bindley*, 157 F.3d at 1242. We now consider the district court's instructions in light of this legal backdrop, the limited federal precedents, and the decisions of state courts applying involuntary intoxication as a defense under state law.

**2**

To better understand how the jury interpreted the instructions, we review them in the same order that they were given to the jury. We begin with the jury instruction on first-degree murder:

To find the defendant guilty of First-Degree Murder in Indian Country you must be convinced that the government has proved each of the following beyond a reasonable doubt:

**First:** the defendant caused the death of Steven Trent Scoggins;

**Second:** the defendant killed Steven Trent Scoggins with malice aforethought;

**Third:** the killing was premeditated;

**Fourth:** the killing took place within the territorial jurisdiction of the United States;

**Fifth:** Steven Trent Scoggins was an Indian; and

**Sixth:** the defendant is not an Indian.

To kill "with malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed, or felt ill will toward the victim at the time.

In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument, and the manner in which death was caused.

A killing is "premeditated" when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.

* * *

Some evidence has been offered that Mr. Rainford was voluntarily intoxicated by drugs at the time of the offense. Evidence that Mr. Rainford acted while under the influence of drugs may be considered by the jury in determining whether or not he acted with a specific intent to kill necessary to commit the offense of first-

23

> degree murder. If the evidence of voluntary intoxication leaves the
> jury with a reasonable doubt about whether Mr. Rainford had a
> specific intent to kill, the jury should find Mr. Rainford not guilty
> of first-degree murder. Voluntary intoxication only applies to
> First-Degree Murder in Indian Country and no other charges
> against Mr. Rainford.

R. I at 383–84. One of the first decisions the jury was instructed to make was whether the killing was premeditated. Of note, the jury was told only that voluntary intoxication "may be considered" in determining whether Rainford had the specific intent to kill. *Id.* at 384. Next, the jury was instructed on second-degree murder:

> If you unanimously find the defendant not guilty of the offense
> charged, First-Degree Murder in Indian Country, or if, after all
> reasonable efforts, you are unable to agree on a verdict as to that
> offense, then you must determine whether the defendant is guilty
> or not guilty of a lesser included offense.
>
> The difference between First-Degree Murder in Indian Country
> and Second-Degree Murder in Indian Country is that, to convict
> the defendant of Second-Degree Murder in Indian Country, the
> government does not have to prove premeditation. Premeditation
> is an element of the greater offense, First-Degree Murder in Indian

24

Country, but not of the lesser included offense, Second-Degree Murder in Indian Country.

*Id.* at 385. But given the order of the instructions, the jury never needed to determine whether Rainford was guilty of second-degree murder because they first found premeditation and convicted him on first-degree murder.

After these instructions, the jury was instructed on Counts Two and Three. Only after considering the three charged offenses was the jury instructed on Rainford's affirmative defenses.

First, the jury was instructed on insanity as a defense. Because insanity requires proving the same facts as involuntary intoxication but with a higher standard of proof, Rainford has acknowledged on appeal that this instruction was superfluous, so we need not consider it any further. What matters for our analysis is the next instruction given to the jury, the instruction for involuntary intoxication:

> The fact that a defendant was in an intoxicated condition at the time of the commission of the crime is usually not a defense. However, where the defendant proves his intoxicated condition was produced involuntarily by innocent mistake, and the intoxication was so severe it resulted in insanity that prevented the defendant from understanding what he was doing or understanding that it was wrong, he is exempt from criminal responsibility.

> Intoxication that simply arouses passions, diminishes perceptions, releases inhibitions or clouds reason and judgment is not enough intoxication, you must find such severe intoxication that the defendant was not able to understand what he was doing or to understand that it was wrong.

25

Thus, if you find the defendant has proven by a preponderance of the evidence all of the following at the time of the crime:

**First:** he was lawfully prescribed Adderall by a health care provider;

**Second:** he used or consumed Adderall as it was prescribed and directed by the health care provider;

**Third:** he was intoxicated by Adderall;

**Fourth:** his intoxicated condition was produced involuntarily by innocent mistake; and

**Fifth:** his intoxicated condition was so severe that it prevented the defendant from understanding what he was doing or understanding that it was wrong;

then you must find the defendant not guilty of all counts.

The fact that a drug has been prescribed can be considered but is not enough on its own to prove intoxication was caused by innocent mistake.

An intoxicated condition produced involuntarily by innocent mistake means that the defendant became intoxicated through no fault of his own.

*Id.* at 394–95. This part of the instructions, explaining the basic elements of involuntary intoxication, is not contested on appeal. These elements conform to the basic requirements that the drugs were "medically prescribed[,]" and that there "is lack of culpability on the part of the defendant in causing the intoxication[.]" *Bindley*, 157 F.3d at 1242. The instructions accurately describe the mental state necessary for it to be a complete defense: an inability for

26

Rainford to appreciate the wrongfulness of his acts. *F.D.L.*, 836 F.2d at 1117.

The instructions were also correct in requiring Rainford to establish

involuntary intoxication by a preponderance of the evidence. *See Dixon*, 548

U.S. at 17 ("[G]iven the long-established common-law rule" for affirmative

defenses, "we presume that Congress intended the petitioner to bear the

burden of proving" an affirmative defense "by a preponderance of the

evidence.").

> Problems arise, however, with the next part of the instructions:
>
> An intoxicated condition produced involuntarily by innocent mistake is not present in any of the following situations:
>
> (1)     where Mr. Rainford was abusing Adderall, whether in the prescribed amount or not;
>
> (2)     where Mr. Rainford was using Adderall along with illegal drugs like methamphetamine;
>
> (3)     where Mr. Rainford had knowledge or should have had knowledge based on warnings or prior experience, of the possible intoxicating effects of Adderall. Warnings about the intoxicating effects of Adderall can come from medical professionals, like doctors or pharmacists, or anyone else familiar with the effects of Adderall; or
>
> (4)     where Mr. Rainford misrepresented facts to his prescribing practitioners in order to obtain Adderall.
>
> If innocent mistake is not present, you may not find involuntary intoxication.

R. I at 395. According to the district court, each of these findings would mean

that Rainford's intoxication was not due to innocent mistake, and thus was

27

voluntary rather than involuntary. In other words, each of the four situations described is a disqualifier that eliminates the jury's ability to acquit Rainford because of involuntary intoxication. On appeal, Rainford argues that disqualifier two, the use of illegal drugs, and disqualifier three, knowledge of possible intoxicating effects, "incorrectly stated the law and directed the jury to reject [Rainford's] defense for impermissible reasons." Op. Br. at 35.

**3**

We first consider disqualifier three, the instruction that Rainford cannot have been involuntarily intoxicated if he "had knowledge or should have had knowledge based on warnings or prior experience, of the possible intoxicating effects of Adderall." R. I at 395.

Rainford argues on appeal that this instruction was legally incorrect because it was overly broad. Any warning about a drug's effects, such as the warning on a prescription bottle, could show that Rainford was warned of the "possible intoxicating effects" of Adderall. The instructions initially defined two kinds of intoxication: minor "[i]ntoxication that simply arouses passions, diminishes perceptions, releases inhibitions or clouds reason and judgment" and "such severe intoxication that the defendant was not able to understand what he was doing or to understand that it was wrong." *Id.* at 394. The jury was instructed that it "must find" the "severe" kind of intoxication to acquit. *Id.* But disqualifier three did not specify severe intoxication. It only asked

28

whether Rainford had knowledge of "possible intoxicating effects[.]" *Id.* at 395. Given that phrasing, the jury could think that knowledge of Adderall's minor intoxicating effects was disqualifying even if Rainford had no knowledge of severe intoxicating effects. While Rainford does not dispute that warnings about a drug are relevant to whether intoxication was involuntary, he argues that the instructions misinformed the jury by making any warning seem dispositive. We agree.

Involuntary intoxication does require that a drug be taken "without defendant's knowledge of its potentially intoxicating effects." *City of Minneapolis v. Altimus*, 238 N.W.2d 851, 857 (Minn. 1976); *but see State v. Gardner*, 601 N.W.2d 670, 675 (Wis. Ct. App. 1999) ("Even if forewarned of the intoxicating effect of a prescription drug, a person should have recourse to the defense if the drug renders him or her unable to distinguish between right and wrong."). But case law also stresses the importance of differentiating between the types of intoxicating effects. The Fourth Circuit in *Perkins* explained that a defendant "is bound to take notice of the warning appearing on a prescription" but is not culpable if the side effects are different than those described in the warning. 228 F.408 at 415–16. There is a difference between a prescription warning that a defendant "might be thrown into an uncontrollable frenzy" and a warning "that he would fall into unconsciousness[.]" *Id.* If a defendant is only warned of the latter, he cannot

29

be held responsible for violent actions caused by a drug, even though "uncontrollable frenzy" and "unconsciousness" could both be considered symptoms of intoxication. *Id.*

A defendant can also be warned about a drug's intoxicating effects if they have previously taken the drug and experienced those effects. *See United States v. Hensler*, 44 M.J. 184, 188 (C.A.A.F. 1996) (differentiating intoxication from mixing prescription drugs and alcohol on a first offense and subsequent offenses, because only in subsequent offenses would the defendant have had knowledge); *see also People v. Turner*, 680 P.2d 1290, 1293 (Colo. App. 1983). But in making that knowledge assessment, a jury must consider the actual mental state of the defendant at the time. "If [a defendant] was so frenzied by a portion of the medicine innocently taken under the direction of the physician that he was thrown into a mental state which placed him beyond his own control and beyond the realization of what might be the ill effect of an overdose, he would not be legally responsible." *Perkins*, 228 F. at 416. The jury heard expert testimony that Rainford believed his delusions to be real and would not have attributed any change in his behavior to his Adderall consumption. As such, there was a basis in the evidence for the jury to find that Rainford might

30

have had warnings and yet did not actually understand the psychological effects of Adderall.

Of course, a defendant's knowledge of a drug's effects is still relevant to the jury's inquiry. Knowledge is necessary to differentiate voluntary and involuntary intoxication in the first place. Defendants have a responsibility to manage the obvious risks of known side effects. *See City of Wichita v. Hull*, 724 P.2d 699, 702 (Kan. App. 1986) (defendant could not claim involuntary intoxication from driving under the influence while on sleeping pills). By its nature, involuntary intoxication is only available for prescription drugs in instances of "unusual and [unexpected] reaction to drugs prescribed by a physician." *Altimus*, 238 N.W.2d at 858. It cannot be a defendant's responsibility to anticipate an unusual reaction based on general warnings that a drug might affect one's mental health.

Likewise, defendants must use prescription drugs as prescribed by their doctor and not voluntarily take greater risks by consuming a higher dosage. *See Com. v. McDermott*, 448 Mass. 750, 779 (2007); *Johnson v. State*, 220 S.E.2d 448, 452 (Ga. 1975); *Gardner*, 601 N.W.2d at 675. But as long as they follow a doctor's advice, they are entitled to assume that a physician's warnings are accurate and that their prescribed dose was not unnecessarily excessive.

31

*See Saldiveri v. State*, 143 A.2d 70, 77 (Md. 1958); *Brancaccio v. State*, 698 So. 2d 597, 599 (Fla. Dist. Ct. App. 1997).

Also, the district court used the term "innocent mistake" in the instruction for all the disqualifiers, which was imprecise. In *Bindley*, we described innocent mistake as a separate category from involuntary intoxication by prescription drug. 157 F.3d at 1242. It properly refers to "an innocent mistake by the defendant about the character of the substance taken, as when another person has tricked him into taking the liquor or drugs." *Altimus*, 238 N.W.2d at 856. Here, there is no question that Rainford knew the substance that he was taking was Adderall, so the jury should not have been instructed that they were to consider whether Rainford's use was an "innocent mistake." Rather, it is better stated in an instruction by asking the jury whether the intoxicated condition was produced involuntarily by no fault of the defendant and then explaining situations where that cannot be found as a matter of law.

Juries must be instructed to carefully consider whether the defendant had knowledge of the risk of the precise type of intoxication that rendered him unable to appreciate the wrongfulness of his actions. That is especially important in cases, such as this one, where a physician prescribed an excessive dose and where the defendant alleges that his mental state was actively degraded by long term, excessive use. All prescription drugs come with some

warnings, and to prevent a jury from finding involuntary intoxication whenever a medication warns of "possible intoxicating effects" would effectively eliminate involuntary intoxication for prescription drugs as a legal defense. What matters is whether a defendant had knowledge of the specific kind of intoxicating effect that is alleged to have occurred. In this case, that means knowledge of Adderall ingestion causing psychosis with symptoms such as paranoia, delusions, and violent mood swings.

Because of the complex nature of this inquiry, the jury should have been instructed to weigh the degree to which Rainford's knowledge rendered his intoxication involuntary. The district court erred by taking this decision out of the jury's hands and instructing them that Rainford could not have been involuntarily intoxicated if they found that he had any knowledge of Adderall's possible intoxicating effects.

**4**

Next, we turn to disqualifier two, the instruction that the jury could not find involuntarily intoxication "where [] Rainford was using Adderall along with illegal drugs like methamphetamine." R. I at 395.

Rainford argues that even if the jury found that he had used methamphetamine on the day of the offense, he could still be considered involuntarily intoxicated by his Adderall prescription if that was found to be the cause of his psychosis. This prior condition of intoxication would have

predated any use of illegal drugs on the day of the offense. Once again, we agree that the district court's instructions were erroneous.[3]

This court has recognized that illegal drug use on its own cannot be the basis for involuntary intoxication. In *Bindley*, we rejected an involuntary intoxication argument where the defendant testified that he had "smoked a marijuana cigarette that must have been laced with another drug." 157 F.3d at 1241. Although the defendant claimed that the substance used as lacing had compelled his behavior, we ruled that involuntary intoxication was not recognized as a defense "in situations involving voluntary ingestion of illegal substances." *Id.* at 1242. Given that marijuana was illegal under both federal law and the law of the defendant's state, the defendant "had no right to assume smoking the marijuana cigarette would produce a predictable effect" and his intoxication was voluntary no matter the substance he ingested. *Id.* at 1243; *see also F.D.L.*, 836 F.2d at 1117 (also refusing to grant an involuntary intoxication instruction for allegedly laced marijuana); *United States v.*

---

[3] The Government argues that Rainford waived any objection to disqualifier two because the defense's theory of the case presented to the jury was that Rainford did not take methamphetamine at all. This argument overstates our waiver standards. "To preserve an objection to jury instructions, a party 'must inform the court of its specific objection and the grounds for the objection before the jury retires to deliberate.'" *United States v. Walker*, 130 F.4th 802, 806 (10th Cir. 2025) (quoting Fed. R. Crim. P. 30(d)). Rainford's counsel did so at trial, so the argument is preserved.

*Costello*, 760 F.2d 1123, 1128 (11th Cir. 1985) (noting that an inmate could not raise involuntary intoxication based on drug use because "the various drugs [the defendant] used were not prescribed by a physician to combat a physical illness").

Rainford is not alleging that he was involuntarily intoxicated because of any illegal drug use. Rather, he argues that he was involuntarily intoxicated over a period of months by a prescription drug, and that any drug use during that period is irrelevant since he was already in a psychotic state. Even assuming that Rainford did use methamphetamine, there is a completely different causal relationship between the intoxicating substances than the one in *Bindley*. The relevant question is not whether Rainford used an illegal drug, but whether methamphetamine was the cause of Rainford's mental state on the day of the offense *instead of* the prescribed Adderall.

The district court's instructions contain no causal or temporal limit on illegal drugs as a disqualifier, they simply state that involuntary intoxication was not present if Adderall was used "along with" illegal drugs. R. I at 395. While the Government focused on Rainford's possible use of methamphetamine on the day of the offense, the jury could have read these instructions to say that any use of illegal drugs, at any time while Rainford was prescribed Adderall, automatically defeats his involuntary intoxication claim. Rainford was prescribed high doses of Adderall for over a year before the shooting and

35

had been prescribed lower doses of Adderall long before. The district court's

instructions potentially mean that any illegal drug use over a period of years

could be disqualifying.

Some courts have held that defendants cannot claim involuntary

intoxication when they voluntarily mix prescription drugs and alcohol. *See*

*U.S. ex rel. Gerrior v. Lane*, 694 F. Supp. 525, 527 (N.D. Ill. 1988); *Jones v.*

*State*, 648 P.2d 1251, 1254–55 (Okl. Cr. App. 1982). But those cases involved

defendants arguing that a drug interaction produced involuntary intoxication.[4]

Independent alcohol use does not eliminate the need for a jury to consider a

defendant's pre-existing state of mind. *See United States v. Knott*, 894 F.2d

1119, 1123 (9th Cir. 1990) (stating that jury instructions "adequately stated

the law" when they "assured that the jury would not strip" a defendant of his

---

[4] Even if this was Rainford's argument, he may still claim involuntary intoxication so long as he alleged that he had no knowledge that mixing his prescription drug and another substance would cause him to be severely intoxicated. *See United States v. Hensler*, 44 M.J. 184, 187 (C.A.A.F. 1996) (A military defendant was entitled to an involuntary intoxication instruction for her first fraternization offense because she "did not have notice that as a result of drinking heavily, taking Prozac, Darvocet and Bellergal, she would end up in a state where she could not appreciate the nature or wrongfulness of her actions."); *Jones v. State*, 648 P.2d 1251, 1258 (Okla. Crim. App. 1982) (The defendant "testified that he was informed at Alcoholics Anonymous meetings about the dangers of taking sedative drugs. Consequently, he was knowledgeable of the risks involved with combining alcohol and drugs.").

insanity defense due to schizophrenia simply because he later voluntarily ingested alcohol).

Under these facts, the jury must try to separate its findings between legal and illegal substance abuse. We can see an example of this sort of determination in the Nebraska case *State v. Bigelow*. 931 N.W.2d 842, 849–50 (Neb. 2019). In that case, the defendant took methamphetamine and was then admitted to a hospital where he was administered three prescription drugs: Haldol, Ativan, and Benadryl. *Id.* at 844. After being given the prescription drugs, he assaulted a hospital security guard. *Id.* The defendant argued that he was involuntarily intoxicated by the three prescription drugs administered to him by the hospital. *Id.* On these facts, the Nebraska Supreme Court noted that "the jury could have found [the defendant's] behavior in the emergency room was caused by his voluntary ingestion of methamphetamine before he was brought to the hospital or by an interaction of the drugs given at the hospital with the methamphetamine he had voluntarily ingested." *Id.* at 849. However, it could just as easily have found "that his behavior was caused solely by the effect of the three drugs given to him at the hospital, in which case, [the defendant] was involuntarily intoxicated." *Id.* "[B]ecause each finding could be supported by the evidence, it was proper for the court to instruct the jury on these options." *Id.*; *see also State v. Voorhees*, 596 N.W.2d 241, 251 (Minn. 1999) (defendant was required to show that intoxication was caused by prescription

37

drug alone, not a combination of the prescription and other drugs, but failed to do so).

The jury in this case should have been given the same options as the jury in *Bigelow*. Instead, it was erroneously told that if Rainford had used any illegal drugs at any point in time, he could not be involuntary intoxicated.

**5**

The government also argues that even if the instructions were erroneous the error was harmless. "It is well-established that the burden of proving harmless error is on the government." *United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007). "A guilty verdict following an erroneous instruction will be upheld if 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Luke-Sanchez*, 483 F.3d 703, 705 (10th Cir. 2007) (quoting *Neder v. United States,* 527 U.S. 1, 15 (1999)). In applying this rule, "we must determine whether the guilty verdict actually rendered in this trial was surely unattributable to the error, not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered." *United States v. Kahn*, 58 F.4th 1308, 1318 (10th Cir. 2023) (citation modified).

We cannot say beyond a reasonable doubt that the guilty verdict was surely unattributable to the erroneous jury instructions. Involuntary intoxication was Rainford's primary defense. The facts of the shooting were not

38

disputed by Rainford; the entire dispute at trial concerned his mental state. The nuances of the involuntary intoxication instruction were of central importance to the case's outcome. Much of the Government's effort was dedicated to showing that, even if Rainford was intoxicated, he was voluntarily intoxicated. The Government elicited testimony from several witnesses that was specifically intended to show that Rainford had used illegal drugs and had knowledge of the potential effects of Adderall use. These disqualifiers were reiterated by the Government during its closing argument, a sure sign of their importance to the Government's case. There is a reasonable likelihood that the jury rejected Rainford's involuntary intoxication defense because of disqualifier two or disqualifier three in the instructions. Given the record, we conclude the instruction error contributed to the verdict reached.

Nor was there such overwhelming evidence against involuntary intoxication that the details, language, and order of the instructions made no difference. Although the facts of the shooting were undisputed, both sides contested the facts surrounding Rainford's Adderall use. Rainford presented testimony from two experts – one of whom was a BOP psychologist – showing that Rainford was involuntarily intoxicated. The jury also heard testimony from Rainford, Rainford's family, and Scroggins' family showing that Rainford suffered from paranoid delusions and had no other motive for shooting Scroggins. The Government presented contrary evidence to counter Rainford's

39

defense, including testimony from its own expert, entries from Rainford's journal, and witnesses such as Rainford's ex-wife and his friend, Tiny. Whether Rainford was involuntarily intoxicated depends entirely on how this evidence is weighed. We cannot say that a reasonable jury given correct instructions would have been certain to reach the verdict that was handed down in this case.

The Government points out that the jury ultimately convicted Rainford of first-degree murder and declined to convict him on the lesser included offense of second-degree murder. According to the Government, this means that the jury rejected even voluntary intoxication as playing a role in the killing, and thus it did not matter how the jury was instructed on involuntary intoxication.

We disagree. The jury's decision to convict on first-degree murder means that they found Rainford premeditated his decision to kill Scroggins, but this decision could be consistent with a finding of either voluntary or involuntary intoxication.

First, we must consider the order in which the jury examined the district court's instructions. Before receiving an instruction as to involuntary intoxication, the jury was given an instruction on first-degree murder. That

40

finding precedes, and is independent of, their finding as to any affirmative defenses.

Second, a finding of premeditation does not mean that a defendant could not have been involuntarily intoxicated. According to the jury instructions, "[a] killing is 'premeditated' when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent." R. I at 383–84. Planning or deliberation are not necessarily inconsistent with involuntary intoxication. Rainford presented evidence that in a state of amphetamine-induced psychosis a person can still "make decisions" that require planning, such as filing a restraining order. R. III at 629–30. However, those decisions might be based on a delusion because psychotic people often "don't know what's real and what's not real" and thus have a compromised "ability to determine right from wrong." *Id.* at 630–31. The jury did not need to find "that the defendant deliberated for any particular length of time" to convict on first-degree murder. *United States v. Treas-Wilson*, 3 F.3d 1406, 1409 (10th Cir. 1993) (quoting *United States v. Slader,* 791 F.2d 655, 657 (8th Cir. 1986)). Thus, even the mental ability to do

41

extremely short-term planning would have been enough for Rainford to have premeditated killing Scroggins.

The jury's findings did not rule out the possibility of voluntary intoxication. While the jury was instructed on voluntary intoxication, those instructions did not say that voluntary intoxication automatically negated premeditation. The instructions merely said that evidence of voluntary intoxication "*may be considered* by the jury in determining whether or not he acted with a specific intent to kill[.]" R. I at 384 (emphasis added). Under these loose guidelines, the jury could easily have determined both that Rainford was voluntarily intoxicated, and that while voluntarily intoxicated he specifically intended to kill Scroggins. The uncontested facts of the killing alone could be sufficient grounds to make this determination. *See United States v. Smith*, 135 F.4th 905, 915 (10th Cir. 2025) ("It is reasonable to infer a conscious awareness of intent to kill when the conduct requires making the decision to aim at the back of someone's head.").

Involuntary intoxication as a complete defense is categorically different than voluntary intoxication as a defense to premeditation as an element of first-degree murder. A finding of voluntary intoxication is merely a potential reason to negate the intent to kill required for first-degree murder. *See United States v. Sands*, 968 F.2d 1058, 1064 (10th Cir. 1992). Voluntary intoxication is only relevant to premeditation because of the implication that an intoxicated

42

defendant is more likely to have killed a victim based on sudden impulse. *See Egelhoff*, 518 U.S. at 46. Such an inquiry has less relevance here, where Rainford alleges a long-term form of intoxication that produced delusions inspiring him to kill Scroggins.

In the context of plain error review, we have found that a conviction for first-degree murder can reduce the likelihood that a jury could have found involuntary manslaughter based on self-defense. *See United States v. Sago*, 74 F.4th 1152, 1162–63 (10th Cir. 2023). But *Sago* was a case where the facts necessary to establish intent to kill overlapped with those showing a lack of self-defense. The defendant testified that he shot the victim because he was afraid that the victim might be armed and trying to hurt him. *Id.* at 1155. The jury rejected this theory in finding intent to kill. Here, by contrast, Rainford could have formed the intent to kill Scroggins even as he suffered from psychosis that made him incapable of understanding the wrongfulness of that action.

The Government also argues that any incorrect instruction as to involuntary intoxication was harmless because Rainford received an insanity instruction. As previously noted, the insanity instruction was essentially unnecessary because it still required proving involuntary intoxication, but with a higher standard of proof. It also contained the same four disqualifiers as the instructions on involuntary intoxication. We cannot discern any reason

why the existence of this unnecessary instruction cures the defects in the district court's involuntary intoxication instruction.

Rainford only argues that the jury instructions were erroneous because they stated that knowledge of Adderall's effects and any illegal drug use while taking Adderall were dispositive. He acknowledges that both factors may still be probative of whether intoxication was involuntary. Although this distinction may seem subtle, it is far from harmless. It was the responsibility of the jury to weigh these factors in determining involuntary intoxication. By incorrectly instructing that these factors categorically barred a finding of involuntary intoxication, the district court improperly took this decision away from the jury. Without this error, we cannot say beyond a reasonable doubt that the jury would have reached the same verdict. Because of the erroneous instruction on involuntary intoxication, we reverse and vacate the district court's judgment and remand for a new trial.

**B**

The second issue raised by Rainford on appeal is the district court's decision to deny a jury instruction on the lesser included offense of involuntary

44

manslaughter.[5] Rainford requested an instruction on involuntary manslaughter based on the imperfect defense of another, specifically his daughter.

"Imperfect defense of another . . . occurs when the defendant subjectively believes deadly force is necessary to prevent death or great bodily harm to another, but his belief is objectively *unreasonable.*" *United States v. Brown*, 128 F.4th 1358, 1366 (10th Cir. 2025). "Imperfect defense of another is a mitigation defense; if a jury finds it applies, the defendant is guilty of involuntary manslaughter, rather than murder." *Id.* "[I]t is error for a district court to refuse to instruct" on imperfect defense of another when the defendant "presents sufficient evidence that he subjectively believed" that another person "faced an imminent risk of death or great bodily harm." *Id.* at 1367.

Rainford alleged that his delusions caused him to subjectively, though unreasonably, believe that Scroggins was in his house and harming his daughter. Rainford made statements during his interrogation that he believed he was defending his daughter, and that he remembered shooting Scroggins

---

[5] The Government argues that the defense's request for a jury instruction on imperfect defense of another was not preserved because their theory was not explained to the district court with enough specificity. The record belies this argument. Defense counsel both submitted a proposed jury instruction and discussed the instruction at length with the district court.

45

inside of his house. Rainford argues that "[f]rom these statements, the jury could have found and inferred that [Rainford] believed he was suddenly confronted in the presence of his home with a man who had molested his daughter, and that he believed the man was there to assault her again." Op. Br. at 41.

The district court denied an instruction on involuntary manslaughter because it believed that the defense's theory of imperfect defense of another required the jury to find involuntary intoxication, which itself is a complete defense. Because we remand for a new trial based on the erroneous instructions as to involuntary intoxication and this instruction is likely to arise again at a retrial, we hold that the district court abused its discretion by rejecting an instruction on involuntary manslaughter.

The district court made a legal error when denying the instruction, and "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). Rainford's imperfect defense of another argument was cognizable not only if he was involuntarily intoxicated, but also if he was voluntarily intoxicated. Voluntary intoxication can support a claim of imperfect defense of another if it shows that a defendant subjectively perceived a situation as different from reality. *See Brown,* 128 F.4th at 1368 (describing the defendant's voluntary use of methamphetamine as evidence bolstering his imperfect defense of another claim). Even if Rainford

46

intentionally abused Adderall or other drugs, he may still have had drug induced delusions that he perceived to be real. If the jury believed that voluntary drug abuse caused Rainford to subjectively believe that he needed to defend his daughter, it could have found involuntary manslaughter based on imperfect defense of another even while finding no involuntary intoxication.

Absent this error, Rainford was entitled to an instruction on involuntary manslaughter. A defendant "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Britt*, 79 F.4th 1280, 1286 (10th Cir. 2023) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). Here, Rainford needed to show some evidence that he "believed that the use of deadly force was necessary to prevent death or great bodily harm" and that such risk was "imminent[.]" *Id.* at 1287. "For the purposes of determining the sufficiency of the evidence, we accept the testimony most favorable to the defendant." *Toledo*, 739 F.3d at 567.

Rainford only points to his statements made during his interrogation as evidence for this defense, but we have previously "cautioned that a trial court may properly deny a defendant's request for a lesser included offense instruction only when there is *no evidence* to reasonably support that conviction." *Id.* at 568 (internal quotation marks omitted). Evidence that is "weak and contradicted" can still be a basis for an instruction. *Id.* at 569

47

(quoting *United States v. Brown*, 287 F.3d 965, 975 (10th Cir. 2002)). Rainford made statements on the day of the shooting indicating that he believed Scroggins had "been in [his] house" and "molested [his] daughter" and that he simply "defended [his] daughter[.]" Ex. 119 at 30:06–30:19. Based on these statements, a reasonable jury could have concluded that Rainford subjectively, but unreasonably, believed he was acting in defense of his daughter. As such, he was entitled to an instruction on involuntary manslaughter.

## C

Again, because we already remand for a new trial, we also need not fully consider Rainford's third claim on appeal. Rainford challenges a portion of the district court's limiting instructions stating that defense counsel "was specifically told by me not to misrepresent to the jury that Dr. Johnson is the [c]ourt's expert" and that he "violated that specific court order in his closing[.]" R. III at 1548–49. Rainford argues that this statement effectively branded defense counsel a liar in front of the jury and was an abuse of discretion by the district court.

All parties acknowledge that defense counsel violated the court's instruction during his closing argument when he referred to Dr. Johnson as the court's expert. Indeed, defense counsel corrected himself in front of the jury and acknowledged that he made a mistake. But offhand corrections do not automatically erase the impact of statements that may confuse the jury.

48

Defense counsel was repeatedly told by the district court to avoid any implication that Dr. Johnson was an expert appointed by the court or the Government. He ignored these warnings by saying that the court "appointed Dr. Johnson" as a "second evaluator" to "get this right." *Id.* at 1508. The district court understandably concluded that defense counsel's own brief correction was "not sufficient for that level of a pretrial violation." *Id.* at 1544.

"The trial court has broad discretion to control the scope of closing argument," *United States v. Baker*, 638 F.2d 198, 203 (10th Cir. 1980), including by giving limiting instructions. Although an instruction was warranted here to avoid jury confusion, we also caution that it is potentially problematic for a district court to tell the jury that an attorney has misrepresented a fact, violated a pretrial order, and said something untrue. *See United States v. Shelton*, 736 F.2d 1397, 1403 (10th Cir. 1984) (noting that the district court's decision to admonish defense counsel in front of the jury was not reversible error because "the trial court did not in [any way] attack defense counsel's credibility"). District courts have other tools, including sanctions, to ensure that attorneys comply with pretrial orders. Because we

49

remand for a new trial, we do not consider or find whether the district court's specific instruction here was an abuse of discretion.

## IV

We are mindful of the tragedy of Trent Scroggins' death under these horrific circumstances and the time and resources that have already been expended to try a case of this nature. But we are duty bound to render a decision that is founded upon governing law. We REVERSE the convictions and REMAND with instructions to the district court to VACATE the judgment and conduct a new trial.